**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| EAT WELL INVESTMENT GROUP INC.,<br><br>Plaintiff,<br><br>v.<br><br>TRxADE HEALTH, INC. n/k/a SCIENTURE HOLDINGS, INC.; SUPERLATUS, INC., SUREN AJJARAPU, PRASHANT PATEL, SHANKAR HARIHARAN, NARASIMHAN MANI, DONALD FELL, MAYUR DOSHI, SUBBARAO JAYANTHI, JEFF NEWELL, MICHAEL L. PETERSON<br><br>Defendants. | Case No: 8:25-cv-35-KKM-AEP<br><br>**PLAINTIFF EAT WELL INVESTMENT GROUP, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY** |

Plaintiff Eat Well Investment Group, Inc. ("Eat Well") respectfully moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for partial summary judgment on the issue of liability, and states the following in support:

## PRELIMINARY STATEMENT

Defendant Scienture Holdings, Inc. ("Scienture") has recently characterized this case as Eat Well's "attempt to rewrite the terms of a series of contracts to obtain relief that it never bargained for." *Dkt. 108, at 1.* The undisputed record shows the opposite.

In January 2023, Scienture received a Nasdaq deficiency notice for failing to maintain the minimum stockholders' equity required for continued listing. It needed an acquisition to survive. Through its counsel at Nelson Mullins and under

the internal codename "Project Tempo," Scienture identified and evaluated Sapientia Technology, LLC – a company owned by Eat Well – as an acquisition target that would cure the deficiency. The transaction was structured as a reverse merger: Superlatus, a holding company that all parties acknowledged was a shell with no assets, would first acquire Sapientia from Eat Well. Superlatus would then merge into a Scienture subsidiary, becoming Scienture's wholly owned subsidiary and delivering Sapientia's value to Scienture's consolidated balance sheet. Scienture's attorneys ran the diligence process, including the diligence on Sapientia itself.

Scienture conditioned its own merger obligations on the completion of the Sapientia acquisition. And when Superlatus failed to complete a second planned acquisition, Sapientia became the asset that justified the entire merger – representing, by Scienture's own corporate representative's testimony, approximately 80% of Superlatus's post-restructuring value.

Eat Well sold Sapientia for $10 million. The central component of the purchase price – $8.5 million – was to be paid in Scienture equity: publicly traded shares, priced by VWAP, released on a defined schedule, and subject to Nasdaq compliance requirements. The First Amendment to the MIPA identified Scienture by name as the entity whose shares would satisfy this obligation. These were not the terms of a side deal with a shell company. They were the terms of a transaction designed from the outset to be performed by Scienture.

Eat Well received none of it. Instead, Scienture created a new class of Series B Preferred Stock stripped of every attribute of economic value – no voting rights,

no dividend rights, no liquidation preference, and no path to conversion without a shareholder vote that Scienture alone controlled. Scienture's interrogatory responses explain why the preferred stock existed: issuing all common stock would have required a shareholder vote before closing on the merger. To sidestep that requirement, Scienture structured a portion of the merger consideration as convertible preferred stock. Scienture designed the conversion trigger. It controlled when the vote would occur. And it refused to schedule one. And when Scienture distributed the merger consideration, it directed 100% of the valuable common stock component – 136,441 shares - to a single recipient: Timothy Alford, the CEO of Superlatus who had negotiated the deal directly with Scienture's CEO, Defendant Ajjarapu.

Under the Amended Merger Agreement, Superlatus was required to deliver an allocation certificate identifying each of its stockholders and their ownership – so that Scienture could distribute the merger consideration on a pro-rata basis. The certificate Scienture's board, its CEO, and attorneys reviewed and accepted implausibly reported that every Superlatus stockholder, including Eat Well, held zero shares, and that Alford should receive the entirety of the common-stock portion of the merger consideration. Scienture used a document stating that no one owned anything to direct all of the common stock to an insider.

The conduct did not stop at the closing. For ten months after the merger, Scienture's CEO and its counsel assured Eat Well that conversion was forthcoming – that the last remaining step was completion of Scienture's financial audit. Eat Well cooperated. It devoted months of uncompensated work to producing the

records that Scienture's auditors required. What Eat Well did not know was that Scienture's CEO had privately abandoned all conversion efforts months earlier. While Eat Well cooperated in reliance on these assurances, Scienture then sold its $22.5 million technology platform, sold Superlatus – the entity holding the $10 million asset Eat Well had sold – for one dollar, and declared two special dividends from which its CEO personally received nearly $2 million. Eat Well, still holding unconvertible and unsellable preferred stock, received nothing from any of it.

Eat Well moves for partial summary judgment on a single issue: Scienture's liability for its failure to deliver the equity consideration owed under the MIPA – $8.5 million in tradeable common stock. Eat Well does not seek summary judgment on the remaining components of the MIPA purchase price (the $350,000 cash payment and the $1,150,000 debenture), which involve separate contractual provisions and are not addressed in this motion.

Eat Well establishes Scienture's liability on three independent grounds: (1) agency, because Superlatus acquired Sapientia at Scienture's direction and for Scienture's benefit; (2) adoption, because Scienture assumed the MIPA's equity obligations through an express commitment in a sworn SEC filing and a course of conduct consistent with being bound; and (3) promissory estoppel, because Scienture induced Eat Well's detrimental reliance through sustained promises of conversion that Scienture had privately abandoned. The Court may grant summary judgment on any one of these theories. Eat Well reserves the question of damages – including the value of the undelivered equity, lost participation in two special dividends, and consequential damages for subsequent proceedings.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

This motion relies on two categories of undisputed facts. The Joint Statement of Undisputed Facts ("JSF"), filed separately, which includes those facts stipulated by both parties and is supported by Exhibits A through O.

In addition, the following Plaintiff's Statement of Material Facts ("PSMF") sets forth additional facts that are undisputed, each supported by specific citations to the summary judgment record, including the Declaration of Spencer MacLean ("MacLean Decl.") and Casey Ingels ("Ingels Decl") filed along with this motion. The PSMF paragraphs are numbered sequentially beginning at ¶ 67 to avoid confusion with the JSF, which run from paragraphs 1 - 66. Citations in the Argument section of this motion use the prefix "JSF" or "PSMF" to identify the source.

### A. The Nasdaq Deficiency and Project Tempo

67. On January 30, 2023, TRxADE Health, Inc. (now Scienture Holdings, Inc.)[1] received a Nasdaq deficiency notice stating that it was not in compliance with Nasdaq's minimum stockholders' equity requirement of $2.5 million, a continued-listing standard for companies trading on the Nasdaq. Without regaining compliance, Scienture faced delisting. *Ajjarapu Dep. 17:19–20:13 (Ingels Decl. Ex. 1).*

---

[1] Throughout the relevant period, Scienture was known as TRxADE Health, Inc. and traded on the Nasdaq under the ticker symbol "MEDS." In September 2024, the company changed its name to Scienture Holdings, Inc. and its ticker symbol to "SCNX." (JSF ¶ 64). References in the record to "TRxADE," "TRxADE Health," or "MEDS" refer to the same entity. This motion uses "Scienture" throughout for clarity regardless of the name in use at the time of the events described.

68. Scienture's leadership discussed potential paths to regain Nasdaq compliance, including raising capital, selling assets, and pursuing a merger-and-acquisition strategy referred to internally as "Project Tempo." *Ajjarapu Dep. 21:7–18; 25:13–22 (Ingels Decl. Ex. 1).*

69. Project Tempo was described as a "broader spectrum" search in which Scienture evaluated potential merger candidates to cure its stockholders' equity deficiency and meet Nasdaq's continued-listing standards. *Ajjarapu Dep. 25:3–22 (Ingels Decl. Ex. 1).*

70. Scienture was introduced to Superlatus as a potential acquisition target through a consultant, John Bakshi. *Ajjarapu Dep. 41:11–15 (Ingels Decl. Ex. 1).*

71. Scienture's former CEO, Ajjarapu testified that Superlatus's business model was a "roll-up strategy" that involved Superlatus acquiring other operating businesses, and described Superlatus as "a holding company." *Ajjarapu Dep. 43:7–12 (Ingels Decl. Ex. 1).*

72. Ajjarapu testified that Scienture's expectation was that Superlatus was "going to bring in the merger of Sapientia Technologies and Prestige Farms," explaining that without them "Superlatus, as I mentioned, is just a shell. We needed operating businesses and not just shells." *Ajjarapu Dep. 43:16–24; 44:4–7 (Ingels Decl. Ex. 1).*

73. When asked what about Sapientia made the company attractive to Scienture, Ajjarapu testified "we are trying to solve an asset into shareholder equity. So we need those two assets to reflect Superlatus to meet our shareholder

equity requirements for NASDAQ. That was the main criteria" *Ajjarapu Dep. 44:23 – 45: 7 (Ingels Decl. Ex. 1).*

**B. Issuance of Equity**

74. The MIPA and the merger were structured to close in immediate sequence. The First Amendment expressly provided that "immediately following the Closing … the Buyer will become a subsidiary of TrxAde Health Inc." and that Eat Well's shares "shall be exchanged for unregistered MEDS public company shares." *JSF, Ex. B, First Amendment to MIPA, § 2.*

75. Eat Well understood that the equity consideration would be delivered through the merger in the form of publicly traded Scienture shares, not as a freestanding equity position in Superlatus. *MacLean Decl. ¶ 9.*

76. Eat Well never received a stock certificate, share ledger entry, or other documentation reflecting ownership of shares in Superlatus. The only equity Eat Well received in connection with its sale of Sapientia was the Series B Preferred Stock issued directly by Scienture through its transfer agent. *MacLean Decl. ¶ 10.*

77. Scienture issued Eat Well 11,643.84 shares of a newly created Series B Preferred Stock. The Certificate of Designation of Series B Preferred Shares provided no voting rights, no dividends, and no liquidation preference. The Series B Preferred Stock was convertible to common stock only upon a shareholder vote. *MacLean Decl, ¶ 12.*

78. Scienture stated in a verified interrogatory response that the preferred-stock structure in the Amended Merger Agreement was adopted to avoid requiring a shareholder vote before closing. Specifically, Scienture stated

that it "understood that any issuance of common stock in an amount constituting 20% or more of the currently issued and outstanding common stock in TRxADE Health, Inc. would first need to be approved by the shareholders" and that "[i]n order to close the Amended Merger Agreement without being required to first submit the issuance of stock to the shareholders of Scienture for approval, the parties to the Amended Merger Agreement agreed to structure the merger consideration … to comprise common stock in an amount equal to 19.99% of currently-outstanding common stock, with the remainder of the Merger Consideration in a new class of preferred shares." *Scienture Second Rog. Resp., No. 1(a) (Ingels Decl, Ex. 3).*

79. To date, Eat Well has not received any component of the $10 million purchase price owed under the MIPA – not the $350,000 cash payment, not the $1,150,000 debenture, and not the $8.5 million in tradeable equity. *MacLean Decl. ¶ 8.*

80. Eat Well was not informed before or at closing that it would receive preferred stock rather than common stock. Eat Well did not learn of the Series B issuance until after making repeated post-closing inquiries. *MacLean Decl. ¶ 11.*

81. Scienture stated in a verified interrogatory response that it "did not believe that Eat Well or any other Superlatus shareholder could be compelled to accept Series B Preferred Stock" as consideration. *Scienture Second Rog. Resp., No. 1(d) (Ingels Decl, Ex. 3).*

82. Scienture stated in a verified interrogatory response that it issued the preferred stock to Eat Well because it "believed that Eat Well had agreed or

consented to the issuance of Series B Preferred Stock because Eat Well entered into the First Amendment to the MIPA, which provided that Eat Well's shares would be exchanged for unregistered MEDS public company shares." *Scienture Second Rog. Resp., No. 1(d) (Ingels Decl, Ex. 3).*

**C. The Allocation Certificate**

83. The Allocation Certificate required under Section 6.11 of the Amended Merger Agreement was reviewed by Scienture's Board of Directors, CEO Ajjarapu, and three Nelson Mullins attorneys: Andy Tucker, Jon Anderson, and David Mannheim. *Scienture Second Rog. Resp., No. 2(a) (Ingels Decl, Ex. 3); see also JSF, Ex. D.*

84. Scienture received the initial Allocation Certificate from Superlatus on July 31, 2023. Scienture rejected it because it "did not include any information concerning the number of shares of Superlatus common stock held by any of the identified shareholders immediately prior to closing" and "Scienture was concerned that that the Allocation Certificate provided by Superlatus did not include information that it was required to include pursuant to Section 6.11 of the Amended Merger Agreement." *Scienture Second Rog. Resp. No. 2(d) (Ingels Decl, Ex. 3).*

85. On August 4, 2023, Superlatus delivered a second Allocation Certificate. *JSF, Ex. D.* Scienture "did not identify any concerns with that Allocation Certificate or its contents that needed to be addressed." *Scienture Second Rog. Resp. No. 2(e) (Ingels Decl, Ex. 3).*

86. Scienture stated it "believed that the Allocation Certificate met the requirements of Section 6.11 of the Amended Merger Agreement, and that refusal to issue stock to the then-shareholders in Superlatus consistent with that Allocation Certificate would have been inconsistent with its obligations owed to Superlatus." *Scienture Second Rog. Resp. No. 2(g) (Ingels Decl, Ex. 3).*

87. Scienture issued no common stock to Eat Well. It directed 100% of the common stock consideration –136,441 shares – to Superlatus CEO Timothy Alford, relying on the second Allocation Certificate. *JSF ¶ 18 and Ex. D*. The Allocation Certificate on which Scienture relied stated that Alford, like every other Superlatus stockholder, held zero shares in Superlatus immediately prior to closing. *JSF, Ex. D*

**D. Scienture's Press Releases and Public Representations**

88. On June 23, 2023, Scienture (then TRxADE) issued a press release titled: "Superlatus, Inc. to Combine with TRxADE HEALTH, Inc., to Create a Global Food Consolidation Platform." *JSF, ¶ 38, Ex. G.* The June 23, 2023 press release described the transaction as a "significant milestone for TRxADE shareholders" and stated that post-merger, Scienture would "pivot its business focus and branding to become an industry-leading processing and forming technologies company" and planned to "divest its existing operating business and assets shortly after the Merger." *JSF, Ex. G.*

89. On July 31, 2023, Scienture issued a press release titled: "TRxADE HEALTH, Inc. Announces Closing of Acquisition of Superlatus, Inc." *JSF ¶ 39, Ex. H.* The July 31 press release stated that, "[u]nder the terms of the amended and

restated agreement and plan of merger shareholders of Superlatus received (i) 136,441 shares of MEDS common stock, representing 19.99% of the total issued and outstanding MEDS common stock at the closing of the Merger, and (ii) 306,855 shares of a new class of MEDS non-voting convertible preferred stock with a conversion ratio 100 to one, **multiplied by such shareholder's pro rata percentage ownership**." *JSF, Ex. H (emphasis added).*

90. The July 31 press release also represented that, "[a]fter the closing of the Merger, TRxADE had regained compliance with the $2,500,000 minimum stockholders' equity requirement set forth in the Nasdaq's listing rule 5550(b)(1)." *JSF, Ex. H.*

91. Scienture's 30(b)(6) representative and current co-CEO, Narasimahn Mani, confirmed that "pro rata" refers to "share holdings in the company at the time of closing" and agreed that "to distribute something on a pro rata basis you need to know each recipient's proportional ownership." *Mani Dep. 29:6–15 (Ingels Decl, Ex. 2).*

92. The July 31 press release did not state that any shareholder would receive only preferred stock, and did not state that a single shareholder would receive all of the common stock. Scienture's corporate representative confirmed both points. *Mani Dep. 30:3–13 (Ingels Decl, Ex. 2).*

**E. Amendment No. 1 and the "Shall Issue" Commitment**

93. Amendment No. 1 to Agreement and Plan of Merger arose because Superlatus failed to complete its acquisition of Prestige Farms, Inc., which was a

condition of the Amended Merger Agreement under Section 8.8. *JSF, Ex. E*; see also *Mani Dep. 34:15 – 35:11 (Ingels Decl, Ex. 2).*

94. Under Amendment No. 1, Superlatus agreed to surrender back to Scienture 289,731 shares of non-voting convertible preferred stock. The 136,441 shares of common stock previously allocated to Timothy Alford under the Allocation Certificate remained unchanged. *JSF, Ex. E.*

95. Section 3 of Amendment No. 1 states:

> Notwithstanding anything to the contrary herein, the Company hereby represents and warrants that surrender of shares provided herein shall not cause Superlatus to default on its obligations to Sapientia and that to the extent the surrender of shares provided herein affects Superlatus' obligations under the purchase agreement for the purchase of Sapientia, the Company shall issue a sufficient number of shares to allow Superlatus to comply with such obligations under the purchase of Sapientia. (JSF, Ex. E, p. 6).

96. Scienture stated in a verified interrogatory response that it "agreed to approve Amendment No. 1, including the entirety of paragraph 3 of that agreement, because Superlatus had failed to consummate an acquisition of Prestige Farms, Inc. as set forth in the Amended Merger Agreement, and Scienture wanted to reduce the Merger Consideration owed under the Amended Merger Agreement to reflect the loss in value associated with Superlatus' failure to acquire Prestige Farms, Inc." *Scienture Second Rog. Resp. No. 4(d) (Ingels Decl, Ex. 3).*

97. Scienture stated in a verified interrogatory response that it "permitted the quoted language to be included because it was requested by its counterparty

to the deal, and because Scienture did not understand the condition precedent to any potential obligation contained in the quoted language could have occurred." *Scienture Second Rog. Resp. No. 3(b) (Ingels Decl, Ex. 3).*

98. Scienture stated in a verified interrogatory response that it "did not believe that the assurance reflected in the final sentence of paragraph 3 of Amendment No. 1 was needed or necessary." *Scienture Second Rog. Resp. No. 4(d) (Ingels Decl, Ex. 3).*

99. Scienture's Board of Directors "reviewed and discussed Amendment No. 1" and "approved the execution" of the document. Attorneys Andy Tucker, Jon Anderson, and David Mannheim reviewed Amendment No. 1 in their capacity as counsel for Scienture. *Scienture Second Rog. Resp. No. 3(a) (Ingels Decl, Ex. 3).*

100. At the time of the closing of the Amended Merger Agreement, all Superlatus equity was canceled and converted into the right to receive Scienture stock. *JSF, ¶ 13, and Ex. C, § 2.6(a).*

101. After Superlatus failed to complete the acquisition of Prestige Farms, Sapientia represented substantially all of the value in Scienture's merger with Superlatus. Scienture's corporate representative confirmed that the restructured transaction valued Superlatus at $12.5 million, that Superlatus owned Sapientia – a business valued at $10 million – and that Sapientia thus represented approximately 80 percent of Superlatus's entire value. *Mani Dep. 37:23–38:8 (Ingels Decl, Ex. 2).*

102. Scienture's corporate representative testified that, following the merger, Superlatus "did not have any shares left." When asked whether Superlatus

was able to issue any shares of its own stock after the merger closed, Scienture stated: "That we are not aware of. We don't have knowledge of that." Scienture further confirmed that, as Superlatus's one-hundred-percent owner, "Scienture should be informed and have the knowledge if Superlatus was going to issue any shares." When asked whether the Scienture board of directors ever granted approval for Superlatus to issue shares post-merger, Scienture answered: "No." *Mani Dep, 31:24 – 32:23 (Ingels Decl, Ex. 2).*

**F. Eat Well's Audit Cooperation and Reliance**

103. Eat Well had no contractual or other independent obligation to assist Scienture with its public-company audit. The MIPA required Eat Well to deliver Sapientia's membership interests and related closing documents at the time of the transaction – obligations Eat Well fully performed in 2023. *MacLean Decl. ¶ 30.*

104. Eat Well was not compensated for any of the work it performed in connection with Scienture's audit. The work was performed at Scienture's request, for Scienture's sole benefit, to satisfy Scienture's obligation to complete its public-company financial statements. *MacLean Decl. ¶ 32-33.*

105. Eat Well would not have devoted the time and resources it did to assisting Scienture's auditors absent the representations from Scienture's CEO and its outside counsel that Eat Well's cooperation was a necessary prerequisite to the conversion of its preferred shares. The March 8, 2024 email from Nelson Mullins attorney Andy Tucker –"We still need the materials so TRxADE can complete its audit so that you can convert the preferred shares" – was understood by Eat Well as a direct statement of the bargain: provide the materials, and

conversion will follow. Every subsequent request from Ajjarapu was understood in the context of that assurance. *MacLean Decl. ¶ 31.*

106. Eat Well's reliance on Scienture's promises also caused it to forbear from pursuing its legal remedies during this period. Had Eat Well known that Ajjarapu ceased all efforts to pursue conversion as early as February 2024, Eat Well would have immediately demanded performance or pursued legal action rather than continuing to cooperate with Scienture's audit and wait for a conversion that was never coming. *MacLean Decl. ¶ 34.*

107. As a direct result of the delay induced by Scienture's promises, Eat Well continued to hold non-dividend-bearing preferred stock past the record dates for both of Scienture's special dividends, which occurred on March 18, 2024 and July 19, 2024. Had the conversion occurred as promised, Eat Well would have held common stock as of those record dates and would have been entitled to participate in those distributions. *MacLean Decl. ¶ 35; JSF ¶ 62.*

**G. Abandonment of Conversion Efforts**

108. Ajjarapu acknowledged in a sworn interrogatory response that he "ceased efforts to schedule a vote to convert the Series B preferred shares to common stock in or about February 2024 and therefore no such vote took place." *Ajjarapu Answers to Interrogatories, Resp. No. 12, p. 10 (Ingels Decl, Ex. 4).*

109. Every assurance Scienture or its counsel gave Eat Well about conversion after February 2024 was made at a time when Ajjarapu had already abandoned any intention of converting Eat Well's shares – and knew it. *Ajjarapu Answers to Interrogatories, Resp. No. 12, p. 10 (Ingels Decl, Ex. 4).* This included

Tucker's March 8, 2024 assurance that Eat Well could "convert the preferred shares" after audit completion (JSF ¶ 51-52); Ajjarapu's March 15, 2024 forwarding of auditor requests with the instruction to "[p]lease look into this otherwise further delays filing" (JSF ¶ 54); Ajjarapu's May 14, 2024 request for additional audit assistance, stating "[p]lease do the needful at the earliest" (JSF ¶ 56); Ajjarapu's May 20, 2024 response that conversion was "[t]hat's not in the agenda" when asked about the preliminary proxy statement (JSF ¶58); and Ajjarapu's July 2, 2024 statement "[w]hen we file proxy will let you know" (JSF ¶ 59).

110. At no point during this period did Scienture, Ajjarapu, or any representative of Scienture inform Eat Well that conversion had been abandoned. *MacLean Decl, ¶29.*

111. After the restructured transaction valued Superlatus at $12.5 million, Scienture's board of directors determined that owning Superlatus was no longer in the company's best interest and approved selling it for one dollar. Scienture never offered to return Sapientia to Eat Well and unwind the transaction in that manner, before approving the $1 sale. *Mani Dep. 38:13–39:19 (Ingels Decl, Ex. 2).*

**<u>APPLICABLE STANDARD AND CHOICE OF LAW</u>**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must identify materials demonstrating the absence of a genuine dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When a properly supported motion for summary judgment is made, the nonmovant must "set forth

specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Delaware law governs all claims. Both the MIPA and the Amended Merger Agreement contain Delaware choice-of-law provisions. The Amended Merger Agreement provides that it "shall be governed by, and construed in accordance with, the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws." (JSF, Ex. C, § 11.5). The MIPA's provision is equally broad, covering any proceeding "arising out of or based upon this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby." (JSF, Ex. A, MIPA § 10.10). The Eleventh Circuit has recognized that provisions of this breadth encompass related claims. See, e.g. *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009).

## ARGUMENT

### I. SCIENTURE IS DIRECTLY LIABLE FOR BREACHING THE MIPA'S EQUITY OBLIGATIONS UNDER AN AGENCY THEORY.

In 2023, Scienture needed to acquire assets to improve its balance sheet and survive as a publicly traded company. (PSMF, ¶ 67). It used Superlatus, a company that Scienture's CEO acknowledged was a worthless shell, as the vehicle to acquire those assets. (PSMF, ¶¶ 70-71). The asset it acquired through that vehicle was Sapientia, the company Eat Well sold for $10 million under the MIPA. (PSMF, ¶72-73; JSF, ¶ 21). After Prestige Farms failed to close, Sapientia was the only asset of value that Superlatus held and the only asset that justified the merger. (PSMF, ¶ 96; JSF, ¶ 26). Under Delaware law, that relationship – where a principal deploys

a shell entity to acquire an asset for the principal's benefit – makes the principal directly liable for the agent's contractual obligations. Because the material facts establishing this relationship are drawn entirely from Scienture's own admissions, agency can be decided as a matter of law. *Otto Candies, LLC v. KPMG, LLP*, 2020 WL 4917596, at *8 (Del. Ch. Aug. 21, 2020).

**A. The Legal Framework for Agency-Based Parent Liability.**

Generally, the only parties liable for breach of a contract are the parties who signed it. But "[w]hen one corporation acts as the agent of a disclosed principal corporation, the latter corporation may be liable on contracts made by the agent." *Compagnie des Grands Hôtels d'Afrique S.A. v. Starwood Capital Grp. Glob. I LLC*, No. 23-2631, 2024 WL 4249723, at *1 (3d Cir. Sep. 20, 2024) (*citing Phoenix Canada Oil Co. v. Texaco, Inc*., 842 F.2d 1466, 1477 (3d Cir. 1988)). Unlike alter-ego theories, agency "does not overlook the distinctions between the entities involved, but instead creates a narrow path to liability focused on the principal's authority and control over the agent's wrongdoing." *Id*. (citing *Otto Candies*, 2020 WL 4917596, at *9).

For an agency theory, "[c]omplete domination by the parent in the general conduct of the subsidiaries' affairs is not a prerequisite." *Otto Candies*, 2020 WL 4917596, at *11 (*citing Phoenix Canada Oil*, 842 F.2d at 1478). "When applying an agency theory, the Court should focus its inquiry on the arrangement between the corporations, the authority given in the arrangement, and the relevance of that arrangement to the Plaintiffs' claim." *Id*.; see also *Chrysler Corp. v. Chaplake Holdings, Ltd*., 822 A.2d 1024, 1035 (Del. 2003)(under the agency theory, the court

may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction).

The Third Circuit has held that agency liability turns on the principal's control at the time of the breach, not at the time of contract formation. *Compagnie des Grands Hôtels*, 2024 WL 4249723, at *2 ("When the cause of action is a breach of contract, the relevant inquiry is not whether the corporate parent existed when the contract was *formed*, but whether it existed when the contract was *breached*.")(emphasis in original). A contrary rule would grant "blanket immunity from agency liability for actions their subsidiaries take pursuant to contracts formed before the parents existed." *Id*. at *3.

That principle applies with even greater force here. Both Scienture and Superlatus existed when the MIPA was executed, but the parent-subsidiary relationship had not yet formed. The breach, however, occurred *after* the merger closed, when Scienture owned 100% of Superlatus and controlled its capacity to perform. If agency liability can attach where the principal does not even exist at the time of contracting, it necessarily attaches where the principal existed, conceived the transaction, directed its execution through its own counsel, and then acquired 100% ownership of the agent before the contractual obligation came due.

**B. Scienture Used Superlatus to Solve Scienture's Problem.**

Superlatus had no independent commercial purpose. Ajjarapu described it as "a holding company" that would use a "roll-up strategy." (PSMF ¶ 71). He testified that Superlatus was supposed to provide both Sapientia and Prestige Farms for consolidation into Scienture, because without them "Superlatus, as I

mentioned, is just a shell," and "[w]e needed operating businesses and not just shells." (PSMF ¶ 72).

**C. Scienture Directed the Acquisition from the Outset.**

Scienture managed the transaction through its own counsel. Nelson Mullins, retained by Scienture for Project Tempo, circulated a diligence request list requesting materials for "each of Superlatus and the subsidiaries it is acquiring, including Sapientia, Inc." (JSF ¶ 35, Ex. F). When diligence fell behind, it was Nelson Mullins that followed up, directing Superlatus to "provide updates on the status of your client's operational acquisitions, which are conditions to getting to signing." (JSF ¶ 36, Ex. F). Scienture's lawyers were conducting diligence on the very asset Eat Well was selling under the MIPA, the conduct of a principal directing its agent's execution of a task, not a passive counterparty awaiting results.

The Amended Merger Agreement reinforced this control. Section 8.7 of the Amended Merger Agreement, executed July 14, 2023, conditioned Scienture's obligation to close on Superlatus first completing its acquisition of Sapientia and provided that Superlatus would "not sign any definitive agreements in connection therewith without the prior approval and input of MEDS and its counsel." (JSF ¶¶ 11, 21). The First Amendment to the MIPA – the agreement that named Scienture as the entity whose shares would satisfy the equity obligation – was entered on July 31, 2023, seventeen days *after*. (JSF ¶ 6). Scienture's contractual right to approve the very amendment that defined its role in the transaction is direct evidence of the principal's right to control.

### D. The Breach Occurred When Scienture's Control Was Absolute.

Upon the merger closing, all existing Superlatus equity was canceled and converted into the right to receive Scienture stock. (JSF ¶ 13 and Ex. C, § 2.6(a)). Superlatus survived only as Scienture's wholly owned subsidiary. Scienture's corporate representative confirmed that Superlatus "did not have any shares left" and that Scienture's board never granted approval for Superlatus to issue shares post-merger. (PSMF ¶ 102). At that point, Superlatus had no capacity to perform the MIPA's equity obligations independently. Only Scienture could act, and Scienture did.

Scienture's handling of the Allocation Certificate demonstrates the scope of that control. Section 6.11 of the Amended Merger Agreement required Superlatus to deliver a certificate documenting the pre-existing ownership of Superlatus common stock. (JSF ¶14, Ex. D). The only purpose for such a requirement is to calculate and allow Scienture to distribute its own equity to Superlatus's shareholders on a pro-rata basis. Scienture's own press release confirmed this framework. It represented to the public and investors that the merger consideration would be distributed based on each shareholder's "pro rata percentage ownership." (PSMF ¶ 89). Scienture's representative confirmed that "pro rata" requires knowing "each recipient's proportional ownership." (PSMF ¶ 91). He further confirmed that the press release did not state that any shareholder would receive only preferred stock, and did not state that a single shareholder would receive all of the common stock. (PSMF ¶ 92).

The Allocation Certificate Scienture received was irreconcilable with that commitment. Scienture rejected the first version Superlatus submitted on July 31, 2023, because the column for share counts was blank. (PSMF ¶ 84). Four days later, Superlatus submitted a second version. It did not fix the problem. It filled the blank column with zeroes – stating that every Superlatus stockholder, including Eat Well, held "0 shares" immediately prior to the merger. (JSF, Ex. D, PSMF ¶ 85). The certificate did not report that Eat Well held fewer shares than Alford – according to the Allocation Certificate, they both held zero. It reported that no stockholder – not Eat Well, not Alford, not anyone – owned any shares at all. A document stating that no one owned anything cannot allocate anything to anyone on any basis, pro rata or otherwise.

Scienture used it to direct 100% of the common stock – 136,441 shares – to Timothy Alford, the same individual who had negotiated the merger terms directly with Ajjarapu (JSF ¶¶ 34, 37, Ex. F), while issuing Eat Well only preferred stock stripped of every attribute of economic value. (PSMF ¶¶ 76-77). A disinterested party following ministerial instructions does not reject one certificate for incompleteness, accept an impossible replacement, and then use it to concentrate all valuable equity in a single insider.

Scienture's control became even more explicit six months later. After Superlatus failed to complete the Prestige Farms acquisition – leaving Sapientia as the only operating asset that justified the merger – Scienture did not disclaim responsibility. It did the opposite. In Amendment No. 1, Scienture clawed back 289,731 shares of preferred stock attributable to the failed acquisition while

expressly warranting that the clawback "shall not cause Superlatus to default on its obligations to Sapientia" and committing that Scienture would "issue a sufficient number of shares" to ensure compliance with the MIPA. (JSF, Ex. E; PSMF ¶¶ 93-95). A principal that restructures a transaction to protect the one obligation its agent successfully performed, while unwinding the one that failed, is not a passive counterparty. It is the party in control.

**E. What Was Breached.**

The MIPA's equity mechanics leave no room for dispute about what Superlatus owed. The purchase price included common stock in Buyer in an amount valued at $8,500,000, priced using a 20-day VWAP – a metric that requires publicly traded stock with an active market. (JSF ¶¶ 9-10). The timing of Eat Well's ability to sell those shares was structured "to comply with applicable securities laws and regulations (NASDAQ)." (JSF ¶ 10). The First Amendment specified that Eat Well's shares "shall be exchanged for unregistered MEDS public company shares." (JSF ¶ 8). "Unregistered" is a standard term describing shares issued in a private placement that are subject to temporary transfer restrictions – not shares that are permanently illiquid, non-voting, non-dividend-bearing, and convertible only upon a shareholder vote the issuer controls and refuses to schedule.

Scienture may respond that it was not a party to the MIPA and simply followed the Allocation Certificate as required by Section 6.11. As discussed above, Scienture did not passively follow the Allocation Certificate. It exercised board-level discretion over the document and chose to accept a second version that was facially deficient. That is not the conduct of a disinterested non-party. A party that

exercises board-level discretion to direct all common stock to the CEO of its agent - and issues nothing of value to the counterparty that sold the underlying asset - has not simply followed anything.

## II. SCIENTURE IS INDEPENDENTLY LIABLE BECAUSE IT ADOPTED THE MIPA'S EQUITY OBLIGATIONS THROUGH ITS EXPRESS COMMITMENTS AND COURSE OF CONDUCT.

Even if the Court does not find an agency relationship, Scienture is independently liable on a separate ground: it adopted the MIPA's equity obligations through its own words and conduct. Under Delaware law, a non-signatory is bound by a contract when (1) the contract contemplates adoption by non-signatories, and (2) the non-signatory manifests an intent to be bound. *Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 344 (Del. Ch. 2003). Adoption "can be accomplished by acts as well as words." *Id.* (*citing Mehul's Inv. Corp. v. ABC Advisors, Inc.*, 130 F. Supp. 2d 700, 707-08 (D. Md. 2001)); see also *AG Mobile Holdings, L.P. v. H.I.G. Mobile, L.P.*, 2025 WL 501088, *16 (Del. Ch. Feb. 13, 2025) (reaffirming framework); *OrbiMed Advisors LLC v. Symbiomix Therapeutics, LLC*, 2024 WL 747567, at *7–8 (Del. Ch. Feb. 23, 2024) (holding acquirer bound by dissolved subsidiary's contracts where it publicly acknowledged obligations and acted consistently with being bound).

### A. Prong 1: The MIPA Was Designed to Be Performed by Scienture.

In *OrbiMed*, generic successor language was sufficient to satisfy the first prong of this test. 2024 WL 747567, at *7. Here, the MIPA goes further: it identifies Scienture by name. The First Amendment replaced a generic "Public Closing" concept with a specific provision: "immediately following the Closing . . . the

Buyer [Superlatus] will become a subsidiary of TrxAde Health Inc., a Delaware corporation ('MEDS')[Scienture], and the Shares of the Company . . . shall be exchanged for unregistered MEDS public company shares." (JSF ¶ 8). The MIPA's commercial terms – VWAP pricing, Form 211 release, Nasdaq compliance – all depend on a public-company structure. Superlatus was never a public company. The only one identified to fulfill that role was Scienture.

Scienture's own interrogatory responses explain why the preferred stock existed. Scienture stated that issuing common stock "in an amount constituting 20% or more of the currently issued and outstanding common stock" would have required a shareholder vote before closing on the merger. (PSMF ¶ 78). To avoid that delay, the parties structured the merger consideration so that the bulk of the equity would be issued as preferred stock with a conversion ratio of 100 – each preferred share converting into 100 common shares once shareholders approved. That kept the issuance of new common stock below 20% and allowed "Project Tempo" to quickly cure its Nasdaq deficiency. What Scienture created the preferred stock for one reason: to get the merger closed without waiting for a vote. Ultimately conversion to common stock was the entire point. Scienture controlled when that vote would happen, but it refused to schedule one.

**B. Prong 2: Scienture Manifested an Unambiguous Intent to Be Bound.**

**1. Scienture Expressly Assumed the MIPA's Equity Obligation in a Sworn SEC Filing.**

On January 11, 2024, Scienture filed Amendment No. 1 to the Amended Merger Agreement with the SEC as a "Material Definitive Agreement." (JSF ¶ 25).

That amendment arose after Superlatus failed to complete the Prestige Farms acquisition. (PSMF ¶ 93). Superlatus agreed to return 289,731 shares of preferred stock, but the 136,441 common shares directed to Alford remained unchanged. (PSMF ¶ 94, JSF, Ex. E). Section 3 states:

> Notwithstanding anything to the contrary herein, the Company hereby represents and warrants that surrender of shares provided herein shall not cause Superlatus to default on its obligations to Sapientia and that to the extent the surrender of shares provided herein affects Superlatus' obligations under the purchase agreement for the purchase of Sapientia, the Company shall issue a sufficient number of shares to allow Superlatus to comply with such obligations under the purchase of Sapientia.
>
> (PSMF ¶ 95, JSF, Ex. E) (emphasis added).

"The Company" is Scienture. The "purchase agreement for the purchase of Sapientia" is the MIPA. Scienture committed, in a document its board reviewed, discussed and approved (PSMF ¶ 99), to issue the shares necessary to satisfy the MIPA's obligations. Under *American Legacy*, an express acknowledgment of this kind constitutes adoption. 831 A.2d at 348 ("there are various public statements by ALF, including statements by its president and chairperson of its board of directors, that provide persuasive evidence that ALF believed it is restricted by and must comply with the MSA.") Under *OrbiMed*, defendant's public statements acknowledging the obligation in connection with a corporate acquisition were dispositive. 2024 WL 747567, at *8.

Scienture cannot simultaneously warrant in a sworn SEC filing that it "shall issue a sufficient number of shares" to satisfy the obligations owed to Eat Well,

and then claim the MIPA's terms are irrelevant to Scienture. Amendment No. 1 is Scienture's own acknowledgment that the MIPA's requirements matter to Scienture, because Scienture made itself responsible for their satisfaction.

**2. Scienture's Defenses Are Individually Meritless and Mutually Contradictory.**

Scienture offers three explanations for Amendment No. 1, but they cancel each other out. Scienture claims it "permitted" the language because it was "requested by its counterparty" (PSMF ¶ 97) – but the origins of a term do not negate its binding effect once a company's board approves and files it with the SEC. Scienture also claims the assurance was not needed or necessary (PSMF ¶ 98) – but a representation and warranty in an executed agreement is binding whether or not the promisor considered it necessary. And Scienture suggests Superlatus could still independently perform – but Superlatus's equity was canceled at the time of the closing, and Scienture confirmed it "did not have any shares left" (PSMF ¶¶ 100, 102), and Scienture's board never authorized Superlatus to issue shares post-merger (PSMF ¶ 102).

Taken together, Scienture's three positions ask the Court to accept that its board of directors – advised by counsel – reviewed, approved, and filed with the SEC a representation and warranty that everyone involved understood to be a meaningless courtesy with no practical effect. That is not a credible account of how a publicly traded company executes a Material Definitive Agreement.

**3. Scienture Partially Performed the MIPA and Publicly Claimed the Transaction as Its Own.**

Scienture's conduct independently confirms adoption. After the merger, Scienture issued 11,643.84 shares of its own newly created Series B Preferred Stock to Eat Well, corresponding to the MIPA's equity consideration. (JSF ¶ 19).[2] The performance was deficient, as the preferred stock did not carry the attributes the MIPA required, but it was performance. And it came from Scienture, in its own name. Partial performance is a strong indicator of adoption. *Am. Legacy*, 831 A.2d at 349 ("non-signatories may implicitly adopt a contract through their conduct, rather than through words"). Scienture also publicly announced that the merger had achieved the objective the Sapientia acquisition was designed to serve. On July 31, 2023, Scienture issued a press release announcing it "had regained compliance with the $2,500,000 minimum stockholders' equity requirement." (PSMF ¶ 90). The Nasdaq cure that justified the entire transaction – including Superlatus's acquisition of Sapientia – was *Scienture's* cure, publicly claimed as such. And the only equity Eat Well received in connection with the sale of Sapientia was issued by Scienture. Eat Well never received any stock or other indicia of ownership from Superlatus. (PSMF ¶ 76).

When asked to justify the Series B issuance to Eat Well, Scienture pointed to the First Amendment to the MIPA, stating that it believed Eat Well consented "because Eat Well entered into the First Amendment to the MIPA, which provided that Eat Well's shares would be exchanged for unregistered MEDS public

[2] At the $7.30 per share price established in the Amended Merger Agreement, 11,643.84 preferred shares at a conversion ratio of 100 yields 1,164,384 common shares worth $8,499,643.20 – the $8.5 million equity component of the MIPA purchase price.

company shares." (PSMF ¶ 82). Scienture's defense of what it issued to Eat Well is built on the premise that the MIPA's language governs what Eat Well was entitled to receive. Scienture cannot rely on the MIPA to defend the adequacy of its performance and simultaneously disclaim any relationship to the MIPA. Against this record, no reasonable factfinder could conclude that Scienture did not adopt the MIPA's equity obligations.

## III. SCIENTURE IS INDEPENDENTLY LIABLE UNDER THE DOCTRINE OF PROMISSORY ESTOPPEL.

Eat Well's promissory estoppel claim provides a third and independent basis for summary judgment on liability. This claim rests on Scienture's own post-closing conduct: a sustained course of clear, written promises, made by Scienture's CEO and its counsel, assuring Eat Well that its preferred shares would be converted to common stock once Scienture completed its audit. Eat Well reasonably relied on those promises and performed substantial, uncompensated work for Scienture's benefit.

To prevail on a claim for promissory estoppel, a plaintiff must establish that: (1) a promise was made; (2) the promisor reasonably expected the promise to induce action or forbearance; (3) the promisee reasonably relied on the promise and acted to its detriment; and (4) injustice can be avoided only by enforcing the promise. *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000). "The purpose of the promissory estoppel doctrine is to prevent injustice." *Id*. at 398.

### A. Element 1: Scienture Made Clear and Definite Promises That Eat Well's Preferred Shares Would Be Converted to Common Stock.

Beginning in September 2023 and continuing through July 2024, Scienture made a series of promises to Eat Well, through its CEO and its outside counsel, assuring Eat Well that conversion of its preferred shares to common stock was forthcoming. These promises were documented in writing. They were not vague expressions of hope or generalized statements of intent; they were specific assurances, made in response to Eat Well's direct inquiries, that linked conversion to concrete conditions within Scienture's control.

The pattern began shortly after the merger closed and Eat Well received its Series B Preferred Stock. On September 6, 2023, in response to Eat Well's request for conversion, Scienture's CEO Ajjarapu stated: "We are waiting on SEC approval to get this meeting going." (JSF ¶ 43 and Ex. I). No such meeting was ever scheduled. No conversion vote was ever placed on the agenda for any shareholder meeting, annual or special. (JSF ¶ 44).

The promises became more specific—and more urgent—in March 2024, at the precise moment that Scienture was executing a series of transactions that would make conversion impossible. On March 7, 2024, one day after Scienture's Board declared an $8.00 per share special dividend for common stockholders, Eat Well emailed Scienture's counsel, Andy Tucker, and Ajjarapu, requesting information about the dividend announcement and the status of conversion. (JSF ¶ 51, Ex. K). Tucker's response, on March 8, 2024, was unambiguous: "We still need the materials so TRxADE can complete its audit so that you can convert the preferred shares." (¶ 52, Ex. K). A reasonable recipient of this communication

would understand it to mean: cooperate with the audit, and conversion will follow. That is a clear and definite promise.

One week later, on March 15, 2024, Ajjarapu personally reinforced this assurance. He forwarded Eat Well an email from Scienture's auditors requesting financial and operational information for Sapientia and wrote: "Please look into this otherwise further delays filing." (JSF ¶ 54, Ex. L). This communication served to deepen Eat Well's reliance on Tucker's promise: it created urgency around the audit timeline and implicitly confirmed the linkage between audit completion and conversion. Ajjarapu was pressing Eat Well to act on the understanding that audit completion was the pathway to conversion.

The pattern continued *for months*. On May 14, 2024, Ajjarapu emailed Eat Well requesting additional assistance with auditor inquiries related to Sapientia, stating: "Please do the needful at the earliest." (JSF, ¶ 56, Ex. M). On May 20, 2024, when Eat Well asked whether a proxy statement related to the conversion vote had been prepared, Ajjarapu responded: "That's not in the agenda." (JSF, ¶¶ 57-58, Ex. N). And on July 2, 2024 - just one week before Scienture declared a second special dividend—Eat Well again inquired about conversion, and Ajjarapu replied: "When we file proxy will let you know." (JSF, ¶ 59, Ex. O).

Taken together, these communications constitute a sustained course of promises spanning nearly a year. They were made by Scienture's CEO and its outside counsel at a national law firm. They were made in writing, in response to direct inquiries, and they linked conversion to specific conditions—SEC approval, audit completion, proxy filing - that Scienture represented were being pursued.

Each promise was consistent with and reinforced the others. The first element of promissory estoppel is satisfied.

**B. Elements 2 and 3: Inducement, Reliance, and Detriment.**

The linkage between promise and inducement was explicit in the communications. Tucker's email began with what Scienture needed ("We still need the materials") and offered conversion as the inducement ("so that you can convert the preferred shares"). Each subsequent request from Ajjarapu solicited Eat Well's audit cooperation with conversion as the implied consideration.

Eat Well's reliance was objectively reasonable. The promises came from Scienture's CEO and its outside counsel at a national law firm, in writing, over ten months. In direct reliance, Eat Well devoted months of uncompensated work to Scienture's audit—producing historical financial statements, tax returns, corporate records, and responding to follow-up auditor inquiries. (JSF ¶ 65; PSMF ¶¶ 103-105). Eat Well had no contractual obligation to provide this assistance (PSMF ¶ 103) and would not have done so absent the conversion assurances (PSMF ¶ 105). The reliance also caused Eat Well to forbear from pursuing legal remedies, ensuring it continued to hold non-dividend-bearing preferred stock past both dividend record dates. (PSMF ¶106).

**C. Element 4: Enforcement Is Necessary to Prevent Injustice.**

Under *Chrysler*, the fourth element – whether injustice can be avoided only by enforcing the promise—is a legal determination for the Court. 822 A.2d at 1034. The Court makes this policy decision upon a finding that the first three elements are satisfied. Id. The undisputed facts demonstrate that enforcement is necessary

here, because the injustice arising from Scienture's promises is not merely incidental - it was the foreseeable and, on this record, the intended consequence of Eat Well's induced reliance. The chronology is undisputed and speaks for itself.

In February 2024 – the same month Scienture sold its health services technology platform for $22.5 million in cash (JSF ¶ 45) – Ajjarapu admitted that he privately "ceased efforts to schedule a vote to convert the Series B preferred shares to common stock." (PSMF ¶¶ 108, 110). He admitted in a sworn interrogatory response that he abandoned all conversion efforts "in or about February 2024" and "therefore no such vote took place." *Id*. He separately admitted that, as of March 2024, he "did not intend to schedule a shareholder vote to convert any Series B preferred shares." (JSF, ¶ 63).

Yet the promises to Eat Well continued. Tucker's March 8 assurance that Eat Well could convert the preferred shares after the audit came well after Ajjarapu had privately abandoned all conversion efforts. Ajjarapu's own March 15 email pressing Eat Well on the audit came after that abandonment. And his July 2 assurance - "When we file proxy will let you know" – came five months *after* Ajjarapu swore off any intention to file a proxy.

While Eat Well cooperated in reliance on these assurances, Scienture executed a sequence of transactions that concentrated value in the hands of insiders. On March 5, 2024, it sold Superlatus – the entity holding the $10 million asset Eat Well had sold under the MIPA – for one dollar, with no valuation analysis. (JSF ¶¶ 46-47). One day later, its board declared an $8.00 per share special dividend; Ajjarapu personally received $1,680,824. (JSF ¶¶ 50, 53). On July 9, 2024,

a second dividend followed; Ajjarapu received an additional $315,154.50. (JSF ¶¶ 60-61). Eat Well, still holding non-dividend-bearing preferred stock, received nothing. (JSF ¶ 62).

The injustice is manifest. Scienture induced Eat Well's cooperation with promises of conversion while simultaneously ensuring that conversion would never occur—and while distributing nearly $2 million to its CEO alone in dividends that Eat Well's continued preferred-stock status prevented it from sharing. Eat Well performed uncompensated work that benefited Scienture's ability to meet its SEC reporting obligations, all while being strung along past the record dates for distributions it would have been entitled to receive had the promised conversion occurred.

Delaware courts have enforced the substance of the broken promise, not merely the cost of reliance, where the promisor induced the promisee's performance and then disclaimed the obligation. See *Rostowsky v. Hirsch*, 2024 WL 4491902, at *14 (Del. Ch. Oct. 15, 2024) (awarding ownership interest under promissory estoppel where defendants induced plaintiff's uncompensated labor and then denied his stake in the business). Here, the promise was conversion to common stock. The remedy is enforcement of that promise, or its equivalent in damages.

The doctrine of promissory estoppel exists to remedy precisely this situation: a party that induces another's reliance through promises and then benefits from that reliance at the promisee's expense. The undisputed facts establish that Scienture made clear promises, that it expected and obtained Eat

Well's reliance, that Eat Well acted to its detriment, and that the resulting inequity can be remedied only by holding Scienture to its commitments. Summary judgment on Eat Well's promissory estoppel claim is warranted.

## CONCLUSION

Eat Well sold a company valued at $10 million. It received nothing of value. The entity that orchestrated the acquisition, directed its execution, issued the equity, used the acquisition to regain compliance with Nasdaq's listing requirements, and warranted in a sworn SEC filing that it would issue sufficient shares if needed to satisfy the MIPA's obligations, now asks this Court to believe it had nothing to do with the Sapientia sale. The undisputed record – drawn almost entirely from Scienture's own verified discovery responses, sworn testimony, and SEC filings – forecloses that position. Each of the three theories presented establishes Scienture's liability independently. The Court need reach only one.

Eat Well respectfully requests that the Court enter an order: (1) Declaring that Scienture is liable to Eat Well for the failure to deliver $8.5 million in common stock, on one or more of the following independent grounds: (a) as principal, for the breach of the MIPA's equity obligations; (b) as a non-signatory that adopted the MIPA's equity obligations through its express commitments and course of conduct; or (c) under the doctrine of promissory estoppel, for inducing Eat Well's detrimental reliance through promises of conversion that Scienture had privately abandoned; and (2) Reserving the determination of damages for subsequent proceedings.

Respectfully submitted,

*/s/ Casey R. Ingels*
Casey Ingels, Esq., WSBA #32981
*Admitted Pro Hac Vice*
INGELS LAW
2916 107th Street South
Lakewood, WA 98499
Direct (253) 341-0252
Email: Casey@ingels.law

*Attorney for Plaintiff*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of March, 2026, I electronically filed the foregoing document with the U.S. District Court. Notice will automatically be electronically mailed to all individuals who are registered with the U.S. District Court CM/ECF System

*/s/ Casey R. Ingels*
Casey Ingels, Esq.