**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

Eat Well Investment Group Inc.,

Plaintiff, Case No.: 8:25-cv-00035-KKM-AEP

v.

Trxade Health, Inc. et al.,

Defendants.
_________________________________/

# MOTION FOR SUMMARY JUDGMENT

Defendants TRxADE Health, Inc. n/k/a Scienture Holdings, Inc. ("Scienture"), Narasimhan Mani, Shankar Hariharan, Subbarao Jayanthi, Mayur Doshi, Donald Fell, Jeff Newell, Michael Peterson, Suren Ajjarapu, and Prashant Patel (the "Scienture Defendants") file this Motion for Summary Judgment, stating:

## ***Preliminary Statement***

In this case, Plaintiff Eat Well, Defendant Scienture, and a company called Superlatus entered into a series of transactions involving the sale of Eat Well's IP to Superlatus and the acquisition of Superlatus by Scienture. Eat Well appointed Superlatus to choose the compensation Eat Well would receive from Scienture in the transaction, if any. Superlatus made its decision and Scienture followed Superlatus's instructions, as required by the contract.

Initially, Eat Well accepted Superlatus's decision. Now, though, Eat Well wants to rewrite the deal to remove the requirement that Scienture follow Superlatus' allocation. Yet, Eat Well has not brought a reformation claim.

Eat Well also brings common law claims against several former and current directors of Scienture, claiming they should have ignored the contract, the company's Articles of Incorporation, and Delaware law to favor Eat Well's preferred shares over the common stockholders.

Eat Well's claims are not cognizable in law. And the circumstances do not compel the Court to squeeze the law into the Kafkaesque maze sought by Eat Well. Scienture received no benefit from Eat Well and retains nothing from Eat Well in the transactions. Superlatus has Eat Well's IP and Scienture received and retains nothing from Superlatus either. Equity does not compel any punishment of Scienture here.

## STATEMENT OF ADDITIONAL FACTS

1. "[F]ollowing the closing of the MIPA and prior to the closing of the Amended and Restated Merger Agreement, Eat Well's equity interest consisted of the number of shares of Superlatus common stock necessary to equal $8.5 million in equity value at closing." Eat Well Resp. to Rogs from Narasimhan Mani, at No. 2, attached hereto as **Exhibit "A"**.

2. At deposition, Eat Well's corporate representative testified as follows:

> Q: So there was a point – there was a period where Eat Well had an equity interest that was Superlatus common stock in an amount representing 8.5 million?
>
> A: Correct. Yes.

MacLean Dep., at 109:20-23, attached hereto as **Exhibit "B"**.

3. After Superlatus provided Scienture with an Allocation Certificate as required by Section 6.11 of the Amended Merger Agreement, Scienture issued Eat

Well 11,643.84 shares of Series B Preferred Stock in reliance on the Allocation Certificate as required by Section 6.11 of the Amened Merger Agreement. *See* Declaration of Suren Ajjarapu, attached hereto as **Exhibit "C"**, at ¶ 5.

4. On June 26, 2023, Scienture filed a Form 8-K with the SEC, attaching the Certificate of Designation of Preferences, Rights and Limitations of Series B Preferred Stock (the "Series B Certificate") as an exhibit. *See* Declaration of Narasimhan Mani, attached hereto as **Exhibit "D"**, at ¶ 3; Ex. "1". A true and correct copy of the Series B Certificate as filed is attached to the Declaration of Narasimhan Mani as Exhibit "2".

5. On June 26, 2024, Scienture filed its Form 10-Q for the Quarterly Period Ended March 31, 2024. *See* Mani Dec., at ¶ 4. A true and correct copy of that Form 10-Q is attached to the Declaration of Narasimhan Mani as Exhibit "3".

**I. *Choice of law.***

Eat Well brings claims for breach of contract, breach of fiduciary duty, negligent misrepresentation, and promissory estoppel. The contracts at issue choose Delaware law, Delaware law applies to the fiduciary duty claims, and the remaining claims are governed by Florida law.

Both the MIPA and the Amended Merger Agreement choose Delaware law. *See* MIPA, at § 10.10(a) ("This agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware".). *See also* Amended Merger Agreement, at § 11.5 ("This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware.").

Regarding Eat Well's fiduciary duty claims, "[i]ndemnification of corporate directors, **like the fiduciary obligations of corporate directors**, is an 'internal affair' of a corporation and is therefore subject to the law of the state of incorporation." *Banco Industrial De Venezuela C.A., Miami Agency v. De Saad*, 68 So.3d 895, 898 (Fla. 2011) (emphasis added) (*quoting Chatlos Found., Inc. v. D'Arata*, 882 So.2d 1021, 1023 (Fla. 5th DCA 2004)). *See also* Fla. Stat. § 607.1505(3) ("This act does not authorize this state to regulate the organization or internal affairs of a foreign corporation authorized to transact business in this state."). Scienture is a Delaware corporation. Delaware law thus applies to Eat Well's fiduciary duty claims.

As to the remaining claims, "[f]ederal courts sitting in diversity apply the forum state's choice-of-law rules." *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998). *See also Hovey v. Tracpath Health, Inc.*, 2025 WL 3251639, at *5 (M.D. Fla. 2025). "Florida resolves conflict-of-laws questions according to the 'most significant relationship' test outlined in the Restatement (Second) of Conflict of Laws." *Grupo Televisa, S.A. v. Telemundo Communications Group, Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). "The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Restatement (Second) Conflict of Laws, § 145. "When the injury occurred in a single, clearly ascertainable state and when the conduct which

caused the injury also occurred there, that state will usually be the state of the applicable law with respect to most issues involving the tort." *Id.*, at cmt. e.

Eat Well has alleged that the allegedly wrongful acts described in its Second Amended Complaint "caused injury to Eat Well ***in Florida***." D.E. 57, at ¶ 29 (emphasis supplied). On the face of the Second Amended Complaint, Defendants' alleged conduct occurred in Florida, and the alleged harm was suffered by Eat Well in Florida. *See* D.E. 57, at ¶¶ 28-29, 31-33. Additionally, the place where the relationship between the parties was centered at the relevant times was also Florida, since the corporate actions at issue "emanated from Florida," were made by or on behalf of "a Florida-based corporation," and "affected Eat Well's financial interests in Florida." *See* D.E. 57.

## II. ***The contracts at issue in this case do not create a right for Eat Well to receive common stock in Scienture.***

"While we have recognized that contracts should be 'read in full and situated in the commercial context between the parties,' the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement." *Town of Cheswold v. Central Delaware Business Park*, 188 A.3d 810, 820 (Del. 2018) (*quoting Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*, 166 A.3d 912, 926-27 (Del. 2017)). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012)

(quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). "[A]n ambiguity exists '[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.'" *Id.* (*quoting Eagle Indus.*, 702 A.2d at 1232). In cases "where the language at issue is clear and unambiguous…the parol evidence rule bars the admission of evidence from outside the contract's four corners to vary or contradict that unambiguous language." *Id.*, at 783.

Section 2.01 of the MIPA provides that "Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Membership Interest, free and clear of all Encumbrances, for the consideration specified in Section 2.02." "Membership Interests" is defined in the first recital of the MIPA as "all of the limited liability company membership interests…of Sapienta [sic] Technology, LLC, a Delaware limited liability company." MIPA, at p. 1. And "Buyer" is defined as "Superaltus [sic] Inc, a Delaware corporation." *Id.* And the "Purchase Price" under the MIPA as amended includes:

> The aggregate purchase price for the Membership Interests shall be ten million dollars ($10,000,000.00) (the "Purchase Price"). **The Buyer [Superlatus]** shall pay the Purchase Price to Seller at the Closing (as defined herein) as follows: (i) three hundred and fifty thousand dollars ($350,000.00) in cash, by wire transfer of immediately available funds in accordance with the wire transfer instructions provided by Seller (the "Closing Date Payment"), (ii) secured debenture in the principal amount of one million, one hundred and fifty thousand dollars ($1,150,000.00) ("Debenture"), and (iii) **common stock in Buyer [Superlatus]** in an amount valued at eight million and five hundred thousand dollars ($8,500,000.00) (the Shares"), which share value shall be set

> before the closing of the Public Closing. The Closing Date Payment shall be made no later than twenty-one (21) Business Days after the Closing.

First Amendment to MIPA, § 2.02(a) (emphasis supplied). *See also* MIPA, at § 2.02(a) (providing for substantially similar aggregate purchase price, including "common stock in Buyer [Superlatus] in an amount valued at $8,500,000.00"). And Eat Well has admitted that upon closing of the MIPA, it received "Superlatus common stock in an amount representing $8.5 million in agreed equity compensation." *See* Plaintiff's Response to Defendant Narasimhan Mani's Interrogatories, at No. 2. *See also* MacLean Dep., 109:20-23.

Eat Well is not identified by name anywhere in the Amended Merger Agreement. § 2.6(a)(ii) provides that

> collectively, the Company's [Superlatus's] shareholders shall be entitled to an aggregate of 30,821,941 shares of MEDS [Scienture] Common Stock at $7.30 per share, which is comprised of (i) 136,441 shares of MEDS Common Stock, representing 19.99% of the total issued and outstanding MEDS Common Stock at Closing, and (ii) 306,855 shares issued as a new class of MEDS non-voting convertible preferred stock with a conversion ratio of 100 (the "Merger Consideration").

§ 6.11 of the Amended Merger Agreement provides that Superlatus

> will prepare and deliver to [Scienture] at the Closing a certificate signed by the Company Board in a form reasonably acceptable to [Scienture] setting forth (as of immediately prior to the Effective Time) (a) each holder of Company Common Shares, (b) such holder's name and address, (c) the number or percentage and type of Company Common Shares held as of the Closing Date for each such holder and (d) the number of shares of MEDS Common Stock to be issued to such holder pursuant to this

> Agreement in respect of the Company Common Shares held by such holder as of immediately prior to the Effective Time (the "Allocation Certificate").

Superlatus delivered the Allocation Certificate to Scienture, which stated that "Eatwell Investment Group, Inc." would receive 0 "Shares of MEDS Common Stock to be Issued at Closing" and 11,643.84 "Shares of MEDS Non-Voting Convertible Preferred Stock to be Issued at Closing". *See* Ex. "1" to Ajjarapu Dec., at p. 2. In reliance on the Allocation Certificate that was incorporated by reference into the Amended Merger Agreement, Scienture issued Eat Well 0 shares of common stock and 11,643.84 shares of Series B Preferred Stock. *See* Ajjarapu Dec., at ¶ 6.

Read together in their entirety, the MIPA, its First Amendment, the Amended Merger Agreement, and the Allocation Certificate clearly and unambiguously provide that Eat Well would receive $8.5 million in common stock in Superlatus, not Scienture, and that its stock in Superlatus would then be exchanged for 11,643.84 shares of non-voting convertible preferred stock in Scienture. Scienture performed under those agreements by providing the 11,643.84 shares that Superlatus negotiated for on behalf of Eat Well. None of those agreements create a right for Eat Well to receive any amount of common stock in Scienture. If the parties to those agreements intended to create a right for Eat Well to receive common stock in Scienture, they could have said so. They chose not to, and this Court should decline Eat Well's invitation to let it rewrite the unambiguous language of those contracts through inadmissible parol evidence.

a. ***Amendment No. 1 to the Amended Merger Agreement does not impose an obligation to issue any additional shares on Scienture.***

In its Amended Complaint, Eat Well points to Amendment No. 1 to Agreement and Plan of Merger ("Amendment No. 1") as evidence that Scienture affirmatively assumed an obligation to issue additional shares to correct some alleged failure by Superlatus to perform under the MIPA. But in order to make this argument, Eat Well refers to a single portion of a single sentence taken out of context, and fails to inform the Court that a previous clause ***in the very same sentence*** is fatal to its argument:

> Notwithstanding anything to the contrary herein, the Company hereby represents and warrants that the surrender of shares provided herein shall not cause Superlatus to default on its obligations to Sapentia [*sic*] and that **to the extent the surrender of shares provided herein, affects Superlatus' obligations under the purchase agreement for the purchase of Sapentia [*sic*]**, the Company shall issue a sufficient number of shares to allow Superlatus to comply with such obligations under the purchase of Sapentia [*sic*].

Amendment No. 1, at § 3 (emphasis supplied). Any purported obligation is explicitly conditioned on the occurrence of a condition precedent that Scienture represented and warranted had not occurred ***in the same sentence***. Eat Well's interpretation of this provision as an admission by Scienture that Superlatus had in fact defaulted on its obligations under the MIPA is flatly inconsistent with the document's plain language and Eat Well's testimony at deposition.

Any purported obligation to issue shares ***only*** arises if "Superlatus' obligations under the [MIPA]" are affected by "the surrender of shares provided" in Amendment No. 1. But Superlatus's obligations under the MIPA could not have been affected by

any surrender of shares in Scienture. Such a surrender would not impact whether or not Superlatus paid Eat Well the $350,000 cash component contemplated by the MIPA, nor would it impact whether Superlatus paid the $1,150,000 under the Debenture contemplated by the MIPA. And, as discussed above, the only stock that Superlatus was obligated to provide to Eat Well under the MIPA was stock in Superlatus. Amendment No. 1's contemplated surrender of shares in TRxADE could not have any impact on the amount of stock in Superlatus Eat Well received under the MIPA.

But in any event, it is undisputed that Amendment No. 1 had ***no effect whatsoever*** on Eat Well's position: Eat Well still maintains the 11,643.84 Series B Preferred Shares it was issued following the closing of the Amended Merger Agreement, and neither the language in Section 3 of Amendment No. 1 nor the surrender of shares contemplated by Amendment No. 1 affected any of Superlatus's obligations owed to Eat Well. *See* MacLean Dep., 134:6-15, 135:2-6, 136:20-137:1. Even if Eat Well is correct that Superlatus or some other party has breached the MIPA, it has not alleged and cannot prove that that breach was caused by "the surrender of shares provided" in Amendment No. 1. Because the clear and unambiguous condition precedent to this alleged obligation has not occurred, no such obligation exists.

## III. ***Scienture did not assume or undertake to pay any debts owed to Eat Well by Superlatus or Sapientia.***

Eat Well also asserts that Scienture is directly liable not only under the MIPA, but also that it assumed Superlatus's obligations under the MIPA as well as a series of

promissory notes originally issued to Eat Well by Sapientia (the "Promissory Notes"). *See e.g.* Dkt. 57, at ¶¶ 10. It relies on three bases for this assertion: first, it claims that Scienture assumed the obligation to pay the debts of Superlatus pursuant to the Amended Merger Agreement and the MIPA. Second, it claims that Scienture's SEC filings constitute an acknowledgement that the debts in question were owed directly by Scienture and not by Superlatus or Sapientia. And finally, it claims that a pair of "audit confirmation letters" attached as Exhibits "D" and "E" to the Second Amended Complaint are an acknowledgement by Scienture that it owed those debts directly. But none of these bases are sufficient to hold Scienture liable under the MIPA or the Promissory Notes as a matter of law.

**a. *The contracts at issue do not contemplate a direct assumption of any of Superlatus's or Sapientia's liabilities by Scienture.***

Eat Well's assertion that Scienture assumed Superlatus's obligations under the MIPA and Sapientia's obligations under the Promissory Notes is unsupported by any of the contracts at issue in this case. The MIPA contemplates a purchase of all of the membership interests in Sapientia by Superlatus. *See* MIPA, at First and Second Recitals; § 2.01. The Amended Merger Agreement contemplates a merger between Superlatus and Foods Merger Sub, Inc., with Superlatus as the surviving corporation and Scienture holding all outstanding stock in Superlatus. *See* Amended Merger Agreement, at Recital C; §§ 2.1, 2.2. But none of those contracts contain any language transferring any liabilities of Sapientia or Superlatus to Scienture. Following the closing of the transactions contemplated by the MIPA, its First Amendment, and the

Amended Merger Agreement, the liabilities of Sapientia and Superlatus remained the liabilities of those respective companies. And Eat Well's corporate representative testified at deposition that it was not aware of any specific provisions in those agreements where Scienture assumed any liabilities of Superlatus, or where Superlatus assumed any liabilities of Sapientia. *See* MacLean Dep., at 187:2-13, 188:21-189:4. This Court should not rewrite the contracts to create an assumption by Scienture of the obligations of Superlatus or Sapientia where the plain language of those contracts does not provide for it.

**b.** ***Scienture's SEC filings do not constitute an assumption of debts owed by Superlatus or Sapientia.***

Eat Well next asserts that Scienture acknowledged that it was directly liable to Eat Well under the MIPA and the Promissory Notes in a Form 10-Q for the reporting period ending March 31, 2024. *See* Dkt. 57, at ¶ 72. Eat Well appears to claim that, because the 10-Q states that "the Company issued a secured debenture to Eat Well Investment Group, Inc.", Scienture meant to assume a direct obligation to pay amounts owed under that debenture. As an initial matter, this alleged "acknowledgement" is inadmissible parol evidence offered to modify the unambiguous terms of the MIPA and Amended Merger Agreement by creating an obligation that the plain language of those agreements does not impose. As a result, this Court should disregard this argument in its entirety.

But even if the Court were to consider this evidence, it is not sufficient to create an assumption of those obligations by Scienture. The definition of "Company" in

Scienture's public filings does not refer solely to Scienture: "[u]nless the context requires otherwise, references to the 'Company,' 'we,' 'us,' 'our,' and 'Trxade', refer specifically to TRxADE HEALTH, INC. **and its consolidated subsidiaries.**" TRxADE Health, Inc. Form 10-Q for the Quarterly Period Ended March 31, 2024, at Note 11 (emphasis supplied).

And the full context of the disclosures made in the March 31, 2024 10-Q makes clear that Scienture did not intend to state that it was directly liable under the debenture or the Promissory Notes. Each time Scienture's 10-Q refers to the debenture or the Promissory Notes, it points out that the liabilities of Superlatus were transferred upon the sale of Superlatus, Inc. to Superlatus Foods, Inc. on March 5, 2024:

> On March 5, 2024, the Company entered into Stock Purchase Agreement with Superlatus Foods, Inc. whereby the Company sold all of its equity shares of Superlatus Inc. to Superlatus Foods, Inc. thereby transferring all assets and liabilities.

TRxADE Health, Inc. Form 10-Q for the Quarterly Period Ended March 31, 2024, at Note 11. And the description of each Promissory Note not only contains that disclaimer, it explicitly states that *Sapientia* entered into those Promissory Notes, not Scienture or even "the Company". *See Id.* Scienture's publicly-filed statements do not include any unambiguous agreement or acknowledgment that Scienture is directly obligated to make any payment to Eat Well. They do not show the "reciprocal assent to a certain and definite proposition" required to create a contractual obligation. *See Koung v. Giordano*, 346 So.3d 108, 114 (Fla. 1st DCA 2022) (rev. denied, 2022 WL 9704533 (Fla. 2022)).

c. ***Exhibits "D" and "E" to the Second Amended Complaint clearly state that the debts at issue in this case were owed by Superlatus or Sapientia.***

Neither Exhibit "D" nor "E" attached to the Amended Complaint contain any explicit assumption by Scienture of the debts owed by Superlatus or Sapientia. To the contrary, both documents explicitly state that the debts in question were owed by Superlatus or Sapientia, not Scienture. *See* Dkt. 57-4, at p.2 (requesting that Eat Well certify that "[t]he above information regarding the obligation **from Superlatus Inc.** agrees with our [Eat Well's] records at December 31, 2023") (emphasis added); Dkt. 57-5, at p. 2 (requesting that Eat Well certify that "[t]he above information regarding the obligation **from Sapientia Technology** LLC agrees with our [Eat Well's] records at December 31, 2023") (emphasis added). And both of those documents were signed by Eat Well or someone authorized to act on its behalf. *See* Plaintiff's Response to Defendant Shankar Hariharan's Request for Admissions Dated December 12, 2025, attached hereto as **Exhibit "E"**, at Nos. 18-19.

In other words, far from evidencing an intent to assume the liabilities of Superlatus or Sapientia, the documents identified as Exhibits "D" and "E" explicitly state that (i) the cash consideration and Debenture owed under the MIPA were "obligation[s] from Superlatus Inc.", and (ii) that the Promissory Notes at issue in Count V are "obligation[s] from Sapentia Technology LLC". Eat Well was specifically given the opportunity to clarify its supposed belief that those amounts were owed to it directly by TRxADE, not by the specific entities identified in those letters, but it did not do so. If these documents show "reciprocal assent" to any "certain and definite

proposition" under *Koung*, that assent is to what the plain language of these documents states: that the obligations are owed by Superlatus and Sapientia, not Scienture.

## IV. ***<u>Eat Well could not have participated in the March 2024 or July 2024 special cash dividends, regardless of whether or when its shares were converted to common stock.</u>***

"Other documents or agreements can be incorporated by reference '[w]here a contract is executed which refers to another instrument and makes the conditions of such other instrument a part of it.'" *Town of Cheswold v. Central Delaware Business Park*, 188 A.3d 810, 819 (Del. 2018). The Amended Merger Agreement states that

> As a condition and inducement to [Superlatus]'s willingness to enter into this Agreement, Suren Ajjarapu and Prashant Patel (the "**Principal Stockholders**") have executed an agreement with [Scienture] date June 28, 2023 (the "**Stock Swap Agreement**"), pursuant to which, at the Closing and immediately following the Merger, [Scienture] shall sell, convey, transfer, assign, and deliver to the Principal Stockholders and the Principal Stockholders shall purchase and accept from [Scienture], all of the issued and outstanding Equity Interests of the MEDS Subsidiaries in exchange for all of the shares of MEDS Common Stock held by the Principal Stockholders.

Amended Merger Agreement, at Recital K (emphasis in original). It also repeatedly states that the parties to the Amended Merger Agreement approve and agree to enter into each of the "Contemplated Transactions," which is defined to include "the Stock Swap". *See* Amended Merger Agreement, at p. 6. Accordingly, the terms of the Stock Swap Agreement are incorporated into the Amended Merger Agreement and the documents must be interpreted consistently with one another.

The Stock Swap Agreement provides that

> The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place simultaneously with the approval by the Trxade shareholders of the conversion of the Series B Preferred Stock issued by Trxade into common stock (the "**Closing Date**"), or at such other day and time as the parties hereto shall agree upon.

Stock Swap Agreement, at ¶ 2.1 (emphasis in original). Immediately upon the approval of conversion of the Series B Preferred Stock—including Eat Well's—Scienture would

> deliver or cause to be delivered to the Shareholders an instrument of transfer, transferring title to the shares and membership interests in the Operating Subsidiaries to the Shareholders.

Stock Swap Agreement, at ¶ 2.3. Exhibit "A" to the Stock Swap Agreement identifies the "Operating Subsidiaries," which includes "Trxade, Inc., a Florida corporation."

In February, 2024, Trxade, Inc. entered into an Asset Purchase Agreement (the "MMS Asset Sale") with Micro Merchant Systems ("MMS"), whereby it sold certain of its assets to MMS in exchange for a sum of money. It is uncontested that the proceeds of that sale formed the money that was distributed to common stockholders in Scienture in the March 2024 and July 2024 special cash dividends referenced in the Amended Complaint. *See* MacLean Dep., at 166:22-4. Scienture was also a party to the MMS Asset Sale, "solely for purposes of Sections 5.7 and 9.13", but neither of those provisions created a right for Scienture to receive payment. *See* MMS Asset Sale, §§ 5.7, 9.13. The only entity entitled to receive payment from MMS under the MMS Asset Sale is Trxade, Inc. *See* MMS Asset Sale, §§ 1.5-1.7.

Taken together, the plain language of these agreements is fatal to Eat Well's claims that it was entitled to participate in the March and July dividend payments.

Regardless of whether Eat Well's shares were converted, or when that conversion would have occurred, there is no way that Eat Well could have participated in any dividend distribution arising from the MMS Asset Sale. First, the simplest scenario: if Eat Well's stock was never converted, it would not have participated in that distribution because its Series B Preferred Shares were not entitled to receive dividends.

And even if Eat Well's stock had been converted, it would not have been eligible to participate in either dividend, regardless of whether that conversion occurred before or after the MMS Asset Sale. Immediately upon the conversion of Eat Well's Series B Preferred Shares, all of the issued and outstanding stock in Trxade, Inc. would have been transferred to Suren Ajjarapu and Prashant Patel, and when it did, Scienture would have lost the ability to direct its former subsidiary to make the proceeds of that sale available for distribution to shareholders as part of a dividend. If the conversion happened prior to the MMS Asset Sale, then the assets that were to be sold would have travelled with Trxade, Inc. And if the conversion happened *after* the MMS Asset Sale but before one or both of the dividends, the funds from which those dividends were made would have been an asset of Trxade, Inc. that would have travelled with Trxade, Inc. pursuant to the Stock Swap Agreement.

It is undisputed that the March and July special cash dividends were made from the proceeds of the MMS Asset Sale. *See* MacLean Dep., at 166:22-4. But if Eat Well's shares had been converted from Series B Preferred Shares to common stock, those proceeds would no longer have been available to Scienture to pay out as dividends. In

other words, regardless of when—or even whether—Eat Well's Series B Preferred Shares were converted, Eat Well would have received the same amounts in March and July of 2024: $0.

### V. ***Eat Well's claims for breach of fiduciary duty fail because no fiduciary duty existed as to Eat Well's rights as a preferred shareholder, and its claims for breach of fiduciary duty arise from the same facts that underly the contractual claims in this case.***

> A board does not owe fiduciary duties to preferred stockholders when considering whether or not to take corporate action that might trigger or circumvent the preferred stockholders' contractual rights. As a general matter, the rights and preferences of preferred stock are contractual in nature. Preferred stockholders are owed fiduciary duties only when they do not invoke their special contractual rights and rely on a right shared equally with the common stock.

*Frederick Hsu Living Trust v. ODN Holding Corporation*, No. 12108-VCL, 2017 WL 1437308, at *21 (Del. Ch. Apr. 14, 2017) (cleaned up). "It is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous." *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010).

None of the Scienture Defendants owed a fiduciary duty to Eat Well prior to the closing of the Amended Merger Agreement, since Eat Well was not a shareholder in Scienture until that agreement closed. But even after Eat Well became a stockholder in Scienture, the bases for its claims that a fiduciary duty existed aries out of "special

contractual rights" Eat Well held as a result of its preferred shares, not on a "right shared equally with the common stock." *Frederick Hsu Living Trust*, 2017 WL 1437308, at *21.

And to the extent Eat Well's bases for its claims for breach of fiduciary duty all arise from the same facts underlying its claims for breach of contract. It explicitly alleges that its claims relating to the issuance of preferred stock and the alleged failure to issue common stock in Scienture arise "under the MIPA, Amended Merger Agreement and Amendment No. 1". Dkt. 57, at ¶¶ 111.a-b. Its claims concerning alleged failures to convert its shares and its resulting ineligibility to participate in dividends arise from the Series B Certificate. And its claims concerning alleged failure to pay the Debenture arise from the MIPA and the Debenture itself. Because each of the bases for Eat Well's claims for breach of fiduciary duty arise from the same facts underlying the MIPA, the First Amendment thereto, the Amended Merger Agreement, the Series B Certificate, or some other contractual obligation at issue in this case, those claims are "foreclosed as superfluous" under Delaware law.

**a. *Eat Well's claims for aiding and abetting breach of fiduciary duty and conspiracy to breach fiduciary duty fail because no fiduciary duty has been breached, and Eat Well cannot prove that the alleged aiders and abettors acted with* scienter.**

"Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach." *In re Mindbody, Inc., Stockholder Litigation*, 332 A.3d 349, 391 (Del. 2024) (*quoting Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001). "To establish *scienter*,

the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper." *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015) (cleaned up). "As we said in *RBC*, 'the requirement that the aider and abettor act with *scienter* makes an aiding and abetting claim among the most difficult to prove.'" *Mindbody*, 332 A.3d at 391 (*quoting RBC*, 129 A.3d at 865-66).

Eat Well's claims for aiding and abetting and conspiracy fail for the same reasons its claims for breach of fiduciary duty fail, as set forth in more detail above. Because no breach of fiduciary duty has occurred, the Scienture Defendants cannot have aided and abetted that non-existent breach, nor can they have conspired to commit a non-existent breach. And in any event, Eat Well cannot show that the Scienture Defendants had actual or constructive knowledge that their conduct was legally improper because their conduct was consistent with the plain terms of the contracts at issue in this case, and the contracts at issue in this case did not create a right for Eat Well to receive common stock in Scienture.

**VI. *Eat Well's claims for promissory estoppel and negligent misrepresentation fail.***

"To state a cause of action for promissory estoppel, a plaintiff must establish the following three elements: (1) a representation as to a material fact that is contrary to a later-asserted position; (2) a reasonable reliance on that representation; and (3) a change in position detrimental to the party claiming estoppel caused by the representation and reliance thereon." *FCCI Ins. Co. v. Cayce's Excavation, Inc.*, 901 So.2d 248, 251 (Fla. 2d DCA 2005). "A preferred shareholder's rights are defined in either

the corporation's certificate of incorporation or in the certificate of designation, which acts as an amendment to a certificate of incorporation. Thus, rights of preferred shareholders are contractual in nature and the construction of preferred stock provisions are matters of contract interpretation for the courts." *In re Appraisal of Metromedia Intern. Group, Inc.*, 971 A.2d 893, 899 (Del. Ch. 2009) (cleaned up).

Eat Well lacks any contractual right to convert its Series B Preferred shares to common stock. Its preferred shares are governed by the Series B Certificate, which provides that "[t]he Series B Preferred Stock is not convertible at the election of the holder." And neither the MIPA nor the Amended Merger Agreement create any obligation to convert any Series B Preferred Stock to common stock. *See* MIPA, *passim*; First Amendment, *passim*; Amended Merger Agreement, *passim*. In other words, Eat Well has no right to force its stock to be converted.

Because it lacks a contractual right to convert its shares, it instead attempts to create that right under theories of promissory estoppel or negligent misrepresentation, claiming that it justifiably relied upon representations made by or on behalf of Scienture and Ajjarapu that it claims "conveyed a clear promise: if Eat Well worked with TrxADE [Health]'s auditors to complete the audit, TRxADE [Health] would move forward with the conversion of Eat Well's preferred shares into common stock." D.E. 57, at ¶ 165. Eat Well claims that it relied on those alleged promises by assisting TRxADE's auditors with an audit and by "defer[ing] pursuing alternative steps to enforce its rights and protect its financial position." D.E. 57, at ¶¶ 167-69.

Finally, Eat Well cannot show that it has suffered any harm as a result of its reliance on any such alleged promise, because its shares are only convertible upon the vote of the shareholders of Scienture, and Eat Well cannot establish that the shareholders would in fact have approved such a conversion.

**a. *The alleged promise that Eat Well claims it relied upon is not sufficiently detailed to support a claim for promissory estoppel or negligent misrepresentation.***

"To succeed in a claim for promissory estoppel, a plaintiff must show that it relied on the defendant's affirmative promise that was 'sufficiently definite in time or term or reasonableness.'" *Crmsuite Corporation v. General Motors Company*, No. 8:20-cv-762-WFJ-AAS, 2021 WL 914170, at *5 (M.D. Fla. 2021) (*quoting W.R. Grace and Co. v. Geodata Services, Inc.*, 547 So.2d 919, 920 (Fla. 1989)). *See also Vencor Hospitals v. Blue Cross Blue Shield of Rhode Island*, 284 F.3d 1174, 1185 (11th Cir. 2002) ("Additionally, promissory estoppel does not apply if the terms of the promise are indefinite.") "[M]ere expectations based upon oral representations regarding future rights of parties to a contract specific in its written terms has been held to be insufficient to support a cause of action." *W.R. Grace*, at 925. (*quoting Smith v. Piezo Technology and Professional Administrators*, 427 So.2d 182 (Fla. 1983)). In a claim for negligent misrepresentation, "[a] party cannot rely to his detriment on an unenforceable promise." *Bankers Trust Co. v. Basciano*, 960 So.2d 773, 779 (Fla. 5th DCA 2007).

None of the correspondence identified by Eat Well contains a definite promise that "if Eat Well worked with [Scienture]'s auditors to complete the audit, [Scienture] would move forward with the conversion of Eat Well's preferred shares into common

stock." Dkt. 57, at ¶ 165. To the contrary, the correspondence from Mr. Ajjarapu attached to the Amended Complaint (Dkts. 57-8, 57-9) do not even mention the conversion of Eat Well's stock, but are requests that Eat Well provide information in connection with an audit. There are no statements in those emails, specific, definite, or otherwise, that even refer to the conversion of Eat Well's stock, let alone promise that it would occur.

The correspondence from Scienture's then-attorney, Andy Tucker (Dkt. 57-7), is similarly indefinite. Mr. Tucker's email states that Scienture "still need[s] the materials so TrxADe can complete its audit so that you can convert the preferred shares." Dkt. 57-7. But this is not a promise that the shares would be converted, or even that the conversion would be submitted to a vote. It is nothing more than a statement of the conditions precedent to any attempt to convert the stock.

Not only that, but the alleged "promise" Eat Well has inferred from that correspondence is itself indefinite. What does it mean to "move forward with the conversion of Eat Well's preferred shares into common stock"? What specific actions did Scienture promise it would take to "move forward", and when did it promise it would take them? Eat Well claims that this promise was "specific", [Dkt 57, at 165], yet offers no details concerning what Scienture actually promised to do, when it promised to do it, or how those actions would result in conversion of its stock. Far from being a specific and definite promise, Eat Well's claims are based on the "mere expectations…regarding future rights of parties to a contract specific in its written terms" that cannot support a cause of action under *W.R. Grace*.

**b.** ***It was unreasonable for Eat Well to interpret the statements in that correspondence as a promise to convert its shares, or to rely on the promise it unreasonably inferred, and any alleged reliance was not detrimental.***

On June 26, 2023, Scienture filed a Form 8-K with the SEC, attaching the Certificate of Designation of Preferences, Rights and Limitations of Series B Preferred Stock (the "Series B Certificate") as an exhibit. *See* Mani Dec., at ¶ 3; Exhibit "1". That Certificate provides the sole manner in which Series B Preferred Stock can be converted to common stock: "[u]pon approval of conversion by the Corporation's stockholders". Series B Certificate, at §§ 7.1, 7.2(a). The Series B Certificate was filed publicly over a month before Eat Well received its Series B Preferred shares. As a result, Eat Well had constructive knowledge at all relevant times that its shares could not be converted without shareholder approval.

Eat Well's interpretation of the correspondence from Mr. Ajjarapu and attorney Tucker was unreasonable given its knowledge of the terms of the Series B Certificate. At all relevant times, Eat Well has known that none of the Defendants could control whether its shares were converted to common stock because that decision was reserved exclusively to Scienture's voting stockholders. And to the extent that Eat Well claims that it has been damaged by the fact that its stock was not converted to common stock, it cannot show that the stockholders would have approved such a conversion. As a result, it cannot establish that its alleged reliance on its interpretation of its correspondence with Mr. Ajjarapu and attorney Tucker was detrimental, or that it suffered damages as a result of that reliance.

## VII. *__Eat Well's claim for unjust enrichment fails because it never conferred a benefit on Scienture, and the transaction at issue is governed by an express contract.__*

> The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff.

*Duty Free World, Inc. v. Miami Perfrum Junction, Inc.*, 253 So.3d 689, 693 (Fla. 3d DCA 2018). "[A] plaintiff cannot pursue an equitable theory, such as unjust enrichment or quantum meruit, to prove entitlement to relief if an express contract exists." *Fulton v. Brancato*, 189 So.3d 967, 969 (Fla. 4th DCA 2016) (alteration in original).

Here, Eat Well alleges that it "conferred a direct and substantial benefit on [Scienture] by transferring ownership of Sapientia Technology Inc. [*sic*] […] through a transaction in which [Scienture] acquired Superlatus, the entity that purchased Sapientia." Dkt. 57, at ¶ 173. On its face, this allegation is fatal to Eat Well's claim of unjust enrichment. First, Eat Well did not confer a benefit on Scienture: any benefit that Eat Well conferred was conferred on Superlatus, "the entity that purchased Sapientia" from Eat Well. And the series of transactions whereby Superlatus purchased Sapientia and Scienture subsequently acquired Superlatus were all governed by express contracts, including but not limited to the MIPA, the First Amendment thereto, and the Amended Merger Agreement.

And under the circumstances, requiring Scienture to pay Eat Well additional amounts would be inequitable. Scienture issued 11,643.84 shares of Series B Preferred

Stock to Eat Well in connection with the merger transaction, stock which Eat Well still holds today. And the alleged benefit that Eat Well conferred was conferred directly to Superlatus, not Scienture. Because Eat Well did not confer a benefit directly on Scienture yet still received stock from Scienture, a finding that Scienture has somehow been unjustly enriched at Eat Well's expense would be unjust and inequitable.

## CONCLUSION

WHEREFORE the Scienture Defendants respectfully request this Court enter an order entering summary judgment in their favor and against Plaintiff Eat Well Investment Group, Inc. on Counts 1-8 and 10 of the Amended Complaint, awarding them their reasonable attorneys' fees and costs associated with the defense of this action, and providing such other relief as this Court deems just and proper.

Dated: March 27, 2026

Respectfully submitted,

*/s/ Paul Thanasides*

Paul Thanasides
Florida Bar No.: 103039
paul@mcintyrefirm.com
clservice@mcintyrefirm.com
Garrett Severson
Florida Bar No.: 108259
garrett@mcintyrefirm.com
complexlit@mcintyrefirm.com
Jorge Callaos
Florida Bar No.: 1020500
jcallaos@mcintyrefirm.com
McIntyre Thanasides Bringgold
Elliott & Grimaldi, P.A.
1228 E 7th Avenue, Suite 100
Tampa, FL 33605
Telephone: 813.223.0000

Facsimile: 813.225.1221
***Counsel for the Scienture Defendants***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 27, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system and served using the CM/ECF system or by regular U.S. Mail to:

Casey R. Ingels, Esq.
casey@ingels.law
Ingels Law
2916 107th Street South
Lakewood, WA 98499
Telephone: 253.341.0252
***Counsel for Eat Well Investment Group Inc.***

Superlatus, Inc.
1521 Concord Pike Ste 201
Wilmington, DE 19803

*/s/ Paul Thanasides*
Attorney