**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

EAT WELL INVESTMENT
GROUP, INC.,

Plaintiff,

v. Case No. 8:25-cv-35-KKM-AEP

TRxADE HEALTH, INC. n/k/a
SCIENTURE HOLDINGS, INC. et al.,

Defendants.

---

**ORDER**

Plaintiff Eat Well Investment Group, Inc., moves for partial summary judgment. Pl.'s MSJ (Doc. 110). Defendants TRxADE Health, Inc. n/k/a Scienture Holdings, Inc.,[1] Narasimhan Mani, Shankar Hariharan, Subbarao Jayanthi, Mayur Doshi, Donald Fell, Jeff Newell, Michael Peterson, Suren Ajjarapu, and Prashant Patel move for summary judgment. Defs.' MSJ (Doc. 115). Each side also moves to exclude the other's damages expert, with Eat Well asserting, separately, procedural and substantive grounds, *see* Mot. to Strike (MTS) (Doc. 76), Pl.'s *Daubert* Mot. (Doc. 109), and the Defendants arguing on substantive grounds alone, *see* Defs.' *Daubert* Mot. (Doc. 114).

---

[1] The parties refer to the company as both TRxADE and Scienture. To reduce confusion, I refer to it only as Scienture.

As explained below, I deny Eat Well's motion for summary judgment, grant in part the Defendants' motion for summary judgment, grant the Defendants' *Daubert* motion, and deny as moot Eat Well's *Daubert* motion and motion to strike.

## I. BACKGROUND

Four businesses entered into various agreements that comprise the heart of this action. Eat Well, the plaintiff, is a Canadian company that processes, distributes, and markets plant-based foods. *See* 2d Am. Compl. (Doc. 57) ¶ 13. Eat Well originally owned Sapientia Technology, LLC, which is a food technology company "specializing in proprietary plant-based extrusion processes." *Id.* ¶ 1. Scienture, the corporate defendant in this action, is a publicly traded Delaware corporation headquartered in Lutz, Florida, that primarily served as a "health services IT company" before it merged with Superlatus. *Id.* ¶ 15. Scienture was known as TRxADE Health, Inc., until September 2024. *Id.* Although no longer a named defendant, Superlatus, Inc., is a Delaware corporation that is a "food technology company" that provides food processing and forming technologies. *Id.* ¶ 16. As will be explained shortly, Superlatus purchased Sapientia from Eat Well and Superlatus then merged into Scienture.

At times relevant to Eat Well's claims, Suren Ajjarapu was the CEO of Scienture and Chairman of Scienture's Board of Directors, *id.* ¶ 14, and

Prashant Patel, Shankar Hariharan, Donald Fell, Subbarao Jayanthi, Narasimham Mani, Mayur Doshi, Jeff Newell, and Michael Peterson were members of the Board of Directors of Scienture, *see id.* ¶¶ 17–24.

On June 16, 2023, Eat Well and Superlatus executed a Membership Interest Purchase Agreement (MIPA), by which Eat Well sold Sapientia to Superlatus. *See* Joint Statement of Undisputed Facts (JSUF) (Doc. 116) ¶ 1; *see generally* MIPA (Doc. 116-1). The preamble to the MIPA states: "This Membership Interest Purchase Agreement (this 'Agreement'), dated as of June 16, 2023 is entered into between Eat Well Investment Group Inc., a Canadian corporation ('Seller') and Superaltus [sic] Inc, a Delaware corporation 'Buyer'." MIPA at 2 (Preamble). The MIPA defines Sapientia as the "Company." *Id.* at 2 (1st Recital). The third recital of the MIPA also identifies that, "simultaneously with the Closing" of the transactions contemplated by the MIPA, "[Superlatus] will be merged with a public company and the Shares of [Sapientia] shall become public shares (the 'Public Closing')." MIPA at 2 (3d Recital).

On July 14, 2023, Scienture, which was not a party to the MIPA or the amended MIPA, JSUF ¶¶ 1, 6, entered into an Amended Merger Agreement (AMA) with one of its then-subsidiaries, Foods Merger Sub, Inc., and Superlatus, which was not a subsidiary of Scienture, *id.* ¶¶ 11–12; *see generally* AMA (Doc. 116-3). The AMA stated that when the merger became effective, and without further action by any parties to the AMA, "any [Superlatus]

Common Shares held as treasury stock immediately prior to the Effective Time shall be canceled and retired and shall cease to exist, and no consideration shall be delivered in exchange therefor; and . . . collectively, [Superlatus'] shareholders shall be entitled to an aggregate of 30,821,941 shares of [Scienture] Common Stock at $7.30 per share, which is comprised of (i) 136,441 shares of [Scienture] Common Stock, representing 19.99% of the total issued and outstanding [Scienture] Common Stock at Closing, and (ii) 306,855 shares issued as a new class of [Scienture] non-voting convertible preferred stock with a conversion ratio of 100 (the 'Merger Consideration')." AMA § 2.6(a)(i)–(ii). Further, the AMA obligated Superlatus to "prepare and deliver to [Scienture] prior to the Closing a certificate signed by the [Superlatus] Board in a form reasonably acceptable to [Scienture] setting forth (as of immediately prior to the Effective Time) (a) each holder of [Superlatus] Common Shares, (b) such holder's name and address, (c) the number or percentage and type of [Superlatus] Common Shares held as of the Closing Date for each such holder and (d) the number of shares of [Scienture] Common Stock to be issued to such holder pursuant to this Agreement in respect of the [Superlatus] Common Shares held by such holder as of immediately prior to the Effective Time (the 'Allocation Certificate')." *Id.* § 6.11. Following the merger, Scienture owned all Superlatus stock. JSUF ¶ 15.

The AMA required that Superlatus complete its acquisition of Sapientia "either before or simultaneously with the Closing" of the merger. AMA § 8.7. It similarly required Superlatus to complete an acquisition of a separate company, Prestige Farms, Inc., "either before or simultaneously with the Closing" of the merger. *Id.* § 8.8. The AMA allowed Scienture to waive either condition and gave Scienture the right to review "all legal and financial information as requested by [Scienture] related to [these] transaction[s]" and Superlatus agreed to "not sign any definitive agreements in connection therewith without the prior approval and input of [Scienture] and its counsel." *Id.* §§ 8.7–8.8.

On July 31, 2023, Eat Well and Superlatus amended the MIPA. *See* JSUF ¶ 6; *see generally* Am. MIPA (Doc. 116-2). The amended MIPA replaced the original third recital, stating that, "immediately following the Closing (as defined below) [Superlatus] will become a subsidiary of [Scienture], and the Shares of [Sapientia] (as defined below) shall be exchanged for unregistered [Scienture] public company shares (the 'Public Closing')." Am. MIPA ¶ 2. For "[c]apitalized terms used in [the amended MIPA] and not otherwise defined in [there]," the amended MIPA incorporated "the meanings ascribed to such terms in the MIPA." *Id.* ¶ 1.

As amended, the "aggregate purchase price" for Sapientia was "ten million dollars ($10,000,000.00) (the 'Purchase Price')." *Id.* § 2.02(a).

Superlatus was to "pay the Purchase Price to [Eat Well] at the Closing . . . as follows: (i) three hundred and fifty thousand dollars ($350,000.00) in cash . . . (ii) secured debenture in the principal amount of one million, one hundred and fifty thousand dollars ($1,150,000.00) ('Debenture'), and (iii) common stock in [Superlatus] in an amount valued at eight million and five hundred thousand dollars ($8,500,000.00) (the 'Shares'), which share value shall be set before the closing of the Public Closing." *Id.* The amended MIPA also required that:

> The Shares will be held in escrow and released to [Eat Well] as follows: for 12 months to comply with applicable securities laws and regulations (NASDAQ); provided, however, that an initial amount for Shares equal to twenty percent (20%) shall be released to [Eat Well] by no later than one Business Day after [Superlatus] files the Form 211. The remaining eighty percent (80%) shall be released to [Eat Well] at 12 months post Public Closing date, with the amount of shares based on a twenty (20) day VWAP. The Shares have not been and are not being registered under the Securities Act of 1933 or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless subsequently registered or sold in reliance on an exemption from registration. If, after the Closing and for a period of six months thereafter, [Superlatus] issues additional capital stock, then [Superlatus] shall take reasonable steps to ensure that [Eat Well] is not diluted. The antidilution protection will not apply to (a) shares issued upon conversion of any convertible securities which are outstanding as of the Closing, (b) shares issued in the exercise on any warrants or options outstanding as of the Closing, (c) any shares issue[d] or issuable by reason of a dividend or stock split, and (d) shares issue[d] or issuable to employees or directors of, or consultants or advisors to, [Sapientia] or any subsidiaries pursuant to a plan or agreement in effect as of the Closing.

*Id.* ¶ 4.

On August 4, 2023, after the merger between Scienture and Superlatus closed, Superlatus provided the required Allocation Certificate to Scienture. JSUF ¶ 16; Allocation Certificate (Doc. 116-4) at 2–4. The Allocation Certificate assigned Eat Well 11,643.84 shares of Scienture Non-Voting Convertible Preferred Stock and assigned all Scienture Common Stock to Tim Alford, who, in his capacity as "Director" of Superlatus, was the sole signatory of the Allocation Certificate. JSUF ¶¶ 17–18; Allocation Certificate at 2–4. "Scienture issued Eat Well 11,643.84 shares of Series B Preferred Stock." JSUF ¶ 19.

On January 8, 2024, Scienture, Foods Merger Sub, Inc., and Superlatus further amended the AMA via "Amendment No. 1." *Id.* ¶ 24. Because Superlatus failed to meet the AMA's condition that it complete the acquisition of Prestige Farms, Inc., the parties to Amendment No. 1 revised the value of Superlatus for purposes of the AMA. *Id.* ¶ 24–26; Amendment No. 1 (Doc. 116-5) at 6–7. Accordingly, Superlatus surrendered to Scienture 289,731 out of 306,855 shares of the Scienture Non-Voting Convertible Preferred Stock. *See* Amendment No. 1 at 7. In Amendment No. 1, the parties noted that Scienture "hereby represents and warrants that surrender of shares provided herein shall not cause Superlatus to default on its obligations to Sapentia [sic] and

that to the extent the surrender of shares provided herein, affects Superlatus' obligations under the purchase agreement for the purchase of Sapentia [sic], [Scienture] shall issue a sufficient number of shares to allow Superlatus to comply with such obligations under the purchase of Sapentia [sic]." *Id.* Thus, "Eat Well maintained the same number of shares in Scienture that it was initially issued in August of 2023." JSUF ¶ 27.

"After receiving the Series B Preferred Shares, Eat Well began requesting their conversion into [Scienture] common stock." *Id.* ¶ 41. In response to one such inquiry, then-Scienture CEO Ajjarapu stated "We are waiting on SEC approval to get this meeting going." *Id.* ¶¶ 42–43. "A vote to convert Eat Well's preferred shares was not placed on the agenda for Scienture's annual shareholder meeting, nor was a special meeting called for that purpose." *Id.* ¶ 44.

In February 2024, Scienture sold a subsidiary for $22.5 million with a potential additional $7.5 million earn-out. *Id.* ¶ 45. On March 5, 2024, Scienture sold its subsidiary, Superlatus, Inc., to an entity named Superlatus Foods, Inc., for one dollar. *Id.* ¶ 46. There was no valuation analysis for Superlatus in connection with the sale. *Id.* ¶ 47. Before the sale, Scienture did not offer to give Eat Well back any membership interest in Sapientia, and Sapientia's intellectual property transferred to Superlatus Foods in the sale. *Id.* ¶¶ 48–49.

The next day, on March 6, 2024, Scienture's Board of Directors "declared a special cash dividend of $8.00 per share of common stock, payable to shareholders of record as of March 18, 2024." *Id.* ¶ 50. The following day, on March 7, 2024, Eat Well again inquired about converting its shares and was told by Scienture's counsel that, "We still need the materials so [Scienture] can complete its audit so that you can convert the preferred shares." *Id.* ¶¶ 51–52. "During February and March 2024, Eat Well assisted Scienture's auditors at the request of . . . Ajjarapu, in connection with Scienture's need to correctly record and audit the acquisition of Sapientia . . . by Superlatus in Scienture's consolidated financial statements." *Id.* ¶ 55. For example, "[o]n March 15, 2024, Mr. Ajjarapu forwarded to Eat Well an email from Scienture's auditors stating: 'Please look into this otherwise further delays filing.' " *Id.* ¶ 54. Nonetheless, "[a]s of March 15, 2024, Ajjarapu did not intend to schedule a shareholder vote to convert any [Scienture] Series B preferred shares . . . to common stock." *Id.* ¶ 63. On May 20, 2024, after seeing a "Preliminary Proxy Statement," Eat Well again inquired of Ajjarapu regarding conversion and was told that conversion was "not in the agenda." *Id.* ¶¶ 57–58.

"On July 9, 2024, Scienture declared a second special dividend of $1.50 per share, payable to holders of common stock as of the July 19, 2024 record date." *Id.* ¶ 60. "Eat Well was not a holder of common stock as of the record

dates for the March 6, 2024 or July 9, 2024 dividends and did not receive payment as part of either dividend." *Id.* ¶ 62.

On January 6, 2025, Eat Well sued the Defendants as well as Superlatus and Tim Alford, the one-time CEO and majority shareholder of Superlatus. *See* Compl. (Doc. 1) ¶ 3. On April 16, 2025, I dismissed Alford from this action because Eat Well failed to timely serve him. (Doc. 51). On July 13, 2026, I dismissed Superlatus from this action because Eat Well failed to timely move for clerk's default according to the Local Rules. (Doc. 151); *see* Local Rules 1.10(b), (d).

The operative complaint asserts ten counts against the Defendants: breach of fiduciary duty against Ajjarapu (Count I); breach of fiduciary duty and aiding and abetting breach of fiduciary duty against Scienture's Board Members other than Ajjarapu (Counts II and III); breach of the amended MIPA against Scienture (Count IV)[2]; breach of promissory notes against Scienture (Count V); promissory estoppel against Scienture and Ajjarapu (Count VI); unjust enrichment against Scienture (Count VII); negligent misrepresentation against Scienture and Ajjarapu (Count VIII); fraudulent transfer against

[2] Although Count IV is described as a claim for breach of the MIPA, Eat Well is suing for breach of Scienture's "obligations under the parties' integrated transaction, including the [amended] MIPA, [AMA], and Amendment No. 1." *See, e.g.*, 2d Am. Compl. ¶ 131.

Scienture for its sale of Superlatus for one dollar (Count IX); and civil conspiracy against Scienture's Board Members and Ajjarapu (Count X).

Eat Well hired a damages expert, Erick West, in support of its claims. *See* West Report (Doc. 114-1). Scienture moves to exclude West's expert testimony. *See* Defs.' *Daubert* Mot. Eat Well opposes. Pl.'s *Daubert* Resp. (Doc. 133). Scienture hired a rebuttal damages expert, Peter Gampel. *See* Gampel Report (Doc. 109-1). Eat Well seeks to disqualify Gampel as an untimely non-rebuttal expert witness, MTS, and to exclude his testimony on substantive grounds, Pl.'s *Daubert* Mot. Scienture opposes both. MTS Resp. (Doc. 85); Defs.' *Daubert* Resp. (Doc. 135).

Eat Well moves for partial summary judgment only as to liability against Scienture for "failure to deliver the equity consideration owed under the [amended] MIPA – $8.5 million in tradeable common stock." *See* Pl.'s MSJ at 4, 35. Scienture opposes. Defs.' Resp. (Doc. 132). The Defendants move for summary judgment on Counts I through VIII and X. *See* Defs.' MSJ at 26. Eat Well opposes. Pl.'s Resp. (Doc. 134). Both sides reply in support. Pl.'s Reply (Doc. 142); Defs.' Reply (Doc. 141).

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate if no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. FED.

R. CIV. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant always bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate a lack of genuine issue of material fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). When that burden is met, the burden shifts to the nonmovant to present evidentiary materials (e.g., affidavits, depositions, exhibits, and so on) demonstrating that there is a genuine issue of material fact, which precludes summary judgment. *See id.* A moving party is entitled to summary judgment if the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

I review the record evidence as identified by the parties and draw all legitimate inferences in the nonmoving party's favor. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262–63 (11th Cir. 2020). Here, to the extent that the record is disputed or capable of multiple inferences, I draw them for the nonmovant.

### B. *Daubert* Motion

Federal Rule of Evidence 702 governs expert testimony, providing:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702.

Trial courts must consider if "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Thelen v. Somatics, LLC*, 156 F.4th 1115, 1131–32 (11th Cir. 2025) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)). The party seeking to introduce the expert at trial bears the burden of establishing qualification, reliability, and helpfulness. *Frazier*, 387 F.3d at 1260. An expert can be qualified to testify about certain matters based on his scientific training, education, knowledge, or experience in the field. *Id.* at 1260–61.

Expert testimony generally helps the trier of fact to understand evidence or decide a fact at issue if the testimony "concerns matters that are beyond the understanding of the average lay person." *Id.* Expert testimony generally will not help the trier of fact if it "offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262–63. And, of course, simply because expert testimony meets the *Daubert* standard does not mean that the testimony is automatically admitted. *See id.* at 1263. Instead, courts must still consider whether that expert testimony satisfies the other Federal Rules of Evidence. *See id.*

## III. ANALYSIS

### A. Summary Judgment

As a preliminary matter, the parties disagree about which law governs which claims. A federal district court sitting in diversity, like here, "must apply the choice of law rules of the forum state." *Rando v. Gov't Emps. Ins. Co.*, 556 F.3d 1173, 1176 (11th Cir. 2009) (citation modified). "Florida enforces choice-of-law provisions unless the law of the chosen forum contravenes strong public policy." *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000). The parties agree that the relevant contracts' choice of law provisions control, both of which call for Delaware law to govern the

agreements. *See* Defs.' MSJ at 3–4; Pl.'s MSJ at 17; MIPA § 10.10(a)[3]; AMA § 11.5. Thus, Delaware law governs the claim that Scienture breached the contracts governing the transaction.

Regarding which law governs the other claims, Eat Well relies on an expansive forum selection clause in the amended MIPA as though it were a choice of law clause requiring Delaware law for all claims. *See* Pl.'s MSJ at 17 (quoting MIPA § 10.10(b), the forum selection clause, rather than § 10.10(a), the choice of law clause). But the choice of law clauses in the relevant contracts do not extend to tort claims. *See* MIPA § 10.10(a) ("This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware . . . ."); AMA § 11.5 ("This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware . . . ."); *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009) ("A choice of law provision that relates only to the agreement will not encompass related tort claims.").

As the Defendants note, "Florida resolves conflict-of-laws questions [in the tort context] according to the 'most significant relationship' test outlined in the Restatement (Second) of Conflict of Laws." (Defs.' MSJ at 4 (quoting *Grupo*

[3] The amended MIPA explicitly incorporated the original MIPA's choice of law and forum provisions. *See* Am. MIPA ¶ 10 ("This Amendment incorporates by reference Section 10.10 of the MIPA.").

*Televisa, S.A. v. Telemundo Communications Group, Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007)). Under that test, the parties appear to agree that Delaware has the most significant relationship for the breach of fiduciary duty, the aiding and abetting breach of fiduciary duty, and the civil conspiracy to breach fiduciary duty claims against the Defendants. *See* Defs.' MSJ at 3–4, 19–20; Pl.'s MSJ at 17; *see also Banco Indus. De Venezuela C.A., Miami Agency v. De Saad*, 68 So. 3d 895, 898 (Fla. 2011) (indicating that claims involving "internal affairs" of a corporation, "like the fiduciary obligations of corporate directors," are "subject to the law of the state of incorporation").

For the negligent misrepresentation claim, the Defendants contend that applying the most significant relationship test results in application of Florida law. *See id.* at 4–5 (identifying Eat Well's allegations that its injuries, and the conduct that caused them, occurred in Florida). Other than by pressing its view that the forum selection clause operates as a choice of law clause, Eat Well does not contest this argument. *See* Pl.'s Resp. at 2–3. Thus, I apply Florida law to the negligent misrepresentation claim.

The parties also disagree about which law applies to the promissory estoppel claim. Eat Well argues for Delaware law. *See* Pl.'s MSJ at 29–34; Pl.'s Resp. at 2–3. The Defendants contend that Florida law governs. Defs.' Resp. at 27–28. But both parties concede that the laws are similar enough that the outcome would be the same. *See* Pl.'s Reply at 11; Defs.' Resp. at 30; Defs.'

Reply at 9. A similar dispute arises regarding the unjust enrichment claim. Eat Well again avers that Delaware law applies. Pl.'s Resp. at 19. The Defendants argue for Florida law. Defs.' MSJ at 25.

Florida's choice of laws rules are silent regarding quasi-contractual claims like promissory estoppel and unjust enrichment. Federal courts appear to have tentatively reached the understandable conclusion that the lex loci contractus doctrine—Florida's approach to claims regarding execution, validity, interpretation, and obligations of contracts—should govern these claims. *See, e.g.*, *Trumpet Vine Invs., N.V. v. Union Cap. Partners I, Inc.*, 92 F.3d 1110, 1119–20 (11th Cir. 1996); *Doe v. Roe*, No. 20-14456, 2022 WL 1447378, at *2 (11th Cir. May 9, 2022); *Motmanco, Inc. v. McDonald's Corp.*, No. 3:04-CV-270-J-99HTS, 2005 WL 1027261, at *4 (M.D. Fla. Mar. 30, 2005). "Under the lex loci contractus method issues concerning the validity and substantive obligations of contracts are governed by the law of the place where the contract is made." *Trumpet Vine*, 92 F.3d at 1119 (applying the analysis to quantum merit and unjust enrichment claims) (citations omitted). "A contract is made where the last act necessary to complete the contract is performed." *Id.* (citing *Jemco, Inc. v. United Parcel Serv., Inc.*, 400 So. 2d 499, 500 (Fla. 3d DCA 1981).

The parties do not brief this issue, and it is unclear what should constitute the last act necessary to complete the "contract" under Eat Well's

theory of promissory estoppel or unjust enrichment. Both claims involve the Defendants' purported promises to "recogniz[e] Eat Well's shareholder rights" in return for Eat Well's sale of Sapientia to Superlatus and later delivery of various "financial records and SEC audit responses relating to the Sapientia business" to Scienture. 2d Am. Compl. ¶ 176 (Count VII – Unjust Enrichment); *see id.* ¶ 165–67 (similar allegations in Count VI – Promissory Estoppel). Whether the last act would have been delivering the financial records to Scienture or Scienture's "recognizing Eat Well's shareholder rights," *id.* ¶ 176, or taking unidentified action to "move forward with the conversion of Eat Well's preferred shares," *id.* ¶ 165, it appears that the last act would have been in Florida because Scienture was, and is, headquartered in Florida. Thus, I apply Florida law to the promissory estoppel and unjust enrichment claims.

**1. Breach of the Integrated Transaction**

Eat Well moves for summary judgment "on a single issue: Scienture's liability for its failure to deliver the equity consideration owed under the [amended] MIPA – $8.5 million in tradeable common stock." Pl.'s MSJ at 4. Eat Well provides three independent theories for Scienture's liability—agency, adoption, and promissory estoppel. *See id.* I address the promissory estoppel claim later. For the first two theories to be relevant, there must be an underlying breach of the amended MIPA regarding the equity component owed to Eat Well as consideration for Sapientia. After all, if Eat Well received the

equity consideration it was owed, meaning there was no such breach, then Scienture's role would be irrelevant.

The provision at issue specifies that Eat Well's consideration for Sapientia from Superlatus "shall be ten million dollars ($10,000,000.00) (the 'Purchase Price')," requiring Superlatus to compensate Eat Well through "common stock in Buyer in an amount valued at eight million and five hundred thousand dollars ($8,500,000.00) (the [']Shares'), which share value shall be set before the closing of the Public Closing." Am. MIPA § 2.02(a). The amended MIPA defines Superlatus as the "Buyer," Eat Well as the "Seller," *see* Am. MIPA at 1 (Preamble), and Sapientia as the "Company," MIPA at 2 (1st Recital). It appears to define "Public Closing" as the exchange of "the Shares of [Sapientia] for unregistered [Scienture] public company shares." Am. MIPA at 2 (3d Recital).

Eat Well views the amended MIPA, the AMA, and Amendment No. 1 as part of an "integrated transaction" that requires reading the separate contracts "as a single text," to the extent possible. Pl.'s Reply at 5; *see* Pl.'s Resp. at 3. The Defendants do not resist this approach, and Delaware law supports it. *See E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1115 (Del. 1985) (holding that separate agreements that are executed close in time, are coordinated, and "work in tandem" form "in essence" one contract and should be examined as such).

In its motion, Eat Well dedicates relatively little argument to establishing a breach of the equity consideration provision, saying little more than that there is "no room for dispute" that "Superlatus owed" Eat Well "common stock in Buyer in an amount valued at $8,500,000, priced using a 20-day VWAP – a metric that requires publicly traded stock with an active market." *See* Pl.'s MSJ at 23. Specifically, "Eat Well's shares '[were to] be exchanged for unregistered [Scienture] public company shares.' " *Id.* (quoting Am. MIPA 3d Recital); *see also* Pl.'s Resp. at 1, 4, 17 (repeating Eat Well's theory that the amended MIPA, either on its own or in conjunction with the AMA and other documents, obliged Scienture to deliver its "common stock" or "publicly traded stock" to Eat Well as consideration for selling Sapientia to Superlatus); Pl.'s Reply at 2 ("Eat Well's $10 million sale of Sapientia was paid for in $8.5 million of Scienture common stock plus cash and a debenture.").

Scienture resists these arguments and separately avers that summary judgment should be granted in its favor on Count IV because the contracts do not create a right for Eat Well to receive any equity other than what it got. *See* Defs.' MSJ at 5–10; Defs.' Resp. at 5–17. Scienture argues that the defined terms in Section 2.02(a) of the amended MIPA are clear and decisive—Superlatus had to provide Eat Well with $8.5 million worth of Superlatus stock. *See* Defs.' MSJ at 6–7.

Eat Well responds primarily by straining against the text of the contract, arguing that Scienture's interpretation would "produce a result no rational party would agree to." Pl.'s Resp. at 3 (citation modified). Eat Well avers that Section 2.02(b) and the third recital of the amended MIPA—the provision defining "Public Closing" as the exchange of "the Shares of [Sapientia] for unregistered [Scienture] public company shares"—establish its interpretation of the contract. *See id.* at 4. Lastly, Eat Well attempts to establish a dispute of material fact. *See id.* at 3–8. Under Delaware law, the interpretation of contractual language is a question of law to be decided by the Court. *See Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991). Courts "will interpret clear and unambiguous terms according to their ordinary meaning." *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language. A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, an ambiguity exists when the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings." *Id.* (citation modified). "If parties introduce conflicting interpretations of a term, but one interpretation better comports with the remaining contents of the document or gives effect to all the

words in dispute, then, as a matter of law and without resorting to extrinsic evidence, the court may resolve the meaning of the disputed term in favor of the superior interpretation." *BioVeris Corp. v. Meso Scale Diagnostics, LLC*, No. CV 8692-VCMR, 2017 WL 5035530, at *5 (Del. Ch. Nov. 2, 2017), *aff'd*, 202 A.3d 509 (Del. 2019) (citation modified). "The moving party will be entitled to summary judgment where it can show its construction of the contract is the only reasonable interpretation." *Id.* (citation modified).

Section 2.02(a) of the amended MIPA unambiguously states that, in terms of equity, Superlatus owed Eat Well "common stock in [Superlatus]" in an amount valued at $8.5 million. Eat Well argues that "[t]his reading is untenable." Pl.'s Resp. at 3. It then characterizes "common stock in Buyer" as an "isolated, ambiguous phrase" and avers that it would have been "commercially absurd" for it to have agreed to receive an "illiquid minority interest" in a "private 'shell' " company. *See id.* at 6, 8. But the definitions in the amended MIPA (and, for that matter, the original MIPA) are clear and unambiguous, and thus, the phrase is too. It is unreasonable to read Section 2.02(a) in the light of those definitions and have different expectations. *See GMG Cap.*, 36 A.3d at 780.

Eat Well also argues that Section 2.02(b), which provides various "commercial terms" largely regarding how and when "the Shares" (defined in Section 2.02(a) as "common stock in Buyer in an amount valued at [$8.5

million]") would be distributed to Eat Well, requires one to ignore the language of Section 2.02(a) and conclude that Eat Well was owed common stock in Scienture. *See* Pl.'s MSJ at 23; Pl.'s Resp. at 3–5, 8; Pl.'s Reply at 2. Eat Well's argument is not that Section 2.02(b) is ambiguous. Instead, Eat Well contends that, because several of the terms within Section 2.02(b), such as its reliance on VWAP pricing[4] and release schedule in compliance with NASDAQ rules, describe stock in a public company rather than stock in a private company (like Superlatus), these references should override the clear language of Section 2.02(a). *See* Pl.'s MSJ at 23; Pl.'s Resp. at 4, 8. To be sure, the terms in 2.02(b) do appear to be a mismatch with Section 2.02(a)'s requirement that Superlatus pay Eat Well, in part, with stock in Superlatus.[5] Scienture does not contest this point. *See* Defs.' Resp. at 11–13. Instead, Scienture argues that this oddity, even if it did create an ambiguity in the contract (though, again, Eat Well does not argue that it does), cannot override the clear language in Section 2.02(a). *See id.* I agree that the ill-fitting nature of portions of Section 2.02(b) and Section 2.02(a) do not alter the meaning of the clear language of Section 2.02(a). *See GMG Cap.*, 36 A.3d at 780; *Stream TV Networks, Inc. v. SeeCubic,*

---

[4] "[A] metric that requires publicly traded stock with an active market." Pl.'s MSJ at 23.

[5] It appears undisputed that the procedures in Section 2.02(b) were not followed, *see* Pl.'s MSJ at 7, Defs.' Resp. at 12, but the claim here is based on a breach of Section 2.02(a) and the consideration owed to Eat Well. *See* 2d Am. Compl. ¶¶ 130–46.

*Inc.*, 279 A.3d 323, 341 (Del. 2022) ("When the contractual provision is clear and unambiguous, the court will give the provision's terms their plain meaning." (citation modified)).

Eat Well next contends that such a reading fails to give meaning to all the provisions of the amended MIPA. *See* Pl.'s Resp. at 3–4. True, a court should, "*where possible*, avoid an interpretation that would render any provision illusory or meaningless." *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, No. CV 8520-VCG, 2017 WL 1191061, at *19 (Del. Ch. Mar. 30, 2017) (emphasis added). Similarly, a court "must give effect to all terms of the instrument, must read the instrument as a whole, and, *if possible*, reconcile all the provisions of the instrument." *Rsrvs. Mgmt., LLC v. Am. Acquisition Prop. I, LLC*, 86 A.3d 1119, 2014 WL 823407, at *3 (Del. 2014) (emphasis added). Here, it is not possible to completely harmonize Section 2.02(a)'s clear referral to Superlatus as "Buyer" and Section 2.02(b)'s vocabulary related to a public company's stock. Either the oft relied upon and clearly defined term of "Buyer" must be changed to "Scienture" in Section 2.02(a), or portions of Section 2.02(b) must be rendered meaningless as they are inapplicable to the stock referred to in Section 2.02(a). This second option is far less disruptive to the agreement as a whole and better comports with the language and the primary thrust of the agreement.

When an "earlier clause conflicts with a later clause," "courts will give preference to" the earlier clause, "the more important or dominant of the two conflicting clauses, or the more specific of the two clauses." *Rsrvs. Mgmt.*, 2014 WL 823407, at *3 (quoting 11 *Williston on Contracts* § 32.15 (4th ed. 2000)). Section 2.02(a) is the more important, and, of course, the earlier, of the two clauses. Neither clause is more specific than the other. Section 2.02(b) merely explains how the parties implement the heart of the requirement at issue in Section 2.02(a), thereby confirming Section 2.02(a)'s primacy. Because Section 2.02(a) sets the consideration Superlatus owed Eat Well, it is more important or dominant than Section 2.02(b), which simply explains the mechanisms for delivery of the consideration. *Cf. Simon-Mills II*, 2017 WL 1191061, at *30 n.377 ("[T]he nature of the consideration is naturally material; it is the gravamen of the agreement."); *Hindes v. Wilmington Poetry Soc.*, 138 A.2d 501, 503 (1958) ("A provision for compensation is certainly one of the most important aspects of any agreement.").

Turning to the AMA and Amendment No. 1, there is no breach of these agreements as far as the equity Eat Well received. The AMA required Scienture to deliver "an aggregate of 30,821,941 shares of [Scienture] Common stock at $7.30 per share, which is comprised of (i) 136,441 shares of [Scienture] Common Stock, representing 19.99% of the total issued and outstanding [Scienture] Common Stock at Closing, and (ii) 306,855 shares issued as a new

class of [Scienture] non-voting convertible preferred stock with a conversion ratio of 100." AMA § 2.6(a)(ii). These shares would be allocated among Superlatus stockholders according to an allocation certificate provided to Scienture by Superlatus' Board. *See* AMA § 6.11. Although the Allocation Certificate did not follow the precise form called for in Section 6.11, it did instruct Scienture on which Superlatus shareholders, including Eat Well, were to receive which Scienture stock and in what amounts. *See* Allocation Certificate at 4. It is undisputed that Scienture issued Eat Well 11,643.84 shares of Scienture Non-Voting Convertible Preferred Stock, valued in the amount of $8.5 million, in accordance with the Allocation Certificate. *See id.*; JSUF ¶¶ 17, 19; Pl.'s MSJ at 28 n.2 (admitting that those 11,643.84 shares, which had a conversion ratio of 100, with the $7.30 share price established in the AMA, was an amount valued at $8.5 million).[6]

Although Amendment No. 1 clawed back shares from some former shareholders of Superlatus, it is undisputed that it did not divest Eat Well of any of the stock that it received from Scienture. *See* JSUF ¶ 27. Thus, under the only reasonable interpretation of the integrated contracts, there is no

[6] As the Defendants note, Eat Well had a slight mathematical error in its calculations, concluding that the shares were worth $8,499,643.20. *See* Defs.' Resp. at 17. The correct valuation was $8,500,003.20. Eat Well does not contest this correction. *See generally* Pl.'s Reply.

breach as to the equity consideration Eat Well was to receive. *See BioVeris Corp.*, 2017 WL 5035530, at *5.

Eat Well also avers that the amended MIPA's third recital overrides the clear language of Section 2.02(a). *See* Pl.'s Resp. at 4. The third recital states: "WHEREAS, immediately following the Closing (as defined below) [Superlatus] will become a subsidiary of [Scienture], and the Shares of the Company (as defined below) shall be exchanged for unregistered [Scienture] public company shares (the 'Public Closing')." Am. MIPA at 2. This is a nonsensical statement as the "Company" is Sapientia and the "Shares" are defined as "common stock in [Superlatus]." *See id.* Thus, in context, the "Public Closing" would be defined to mean the exchange of the common stock in Superlatus that Sapientia owned for unregistered Scienture public company shares. *See id.* Of course, it was Eat Well, not Sapientia, that acquired shares in Superlatus according to Section 2.02(a) and those shares were in consideration for Eat Well selling Sapientia to Superlatus.

Neither party appears to recognize, much less address, this problem. Instead, they offer competing interpretations of the third recital. Eat Well seemingly ignores the definition of "Shares," arguing that the third recital should be read to mean that shares of Sapientia were to be exchanged for "unregistered [Scienture] public company shares." *See* Pl.'s MSJ at 23; Pl.'s Resp. at 4. Eat Well fails to account for the fact that Sapientia had only

membership interests, not shares. *See* MIPA at 2 (1st Recital). For their part, the Defendants ignore the definition of the "Company" and contend that the third recital means that Eat Well should have received shares in Superlatus, which would then be "exchanged for unregistered [Scienture] public company shares." *See* Defs.' Reply at 4.

No party argues that there is a scrivener's error or that "(as defined below)" following "the Shares of the Company" indicates that "the Shares of the Company" is a separate, to-be-defined term that the drafters forgot to define, or that the definition of the "Company" as "Sapientia" should not apply in this context because that definition is found above—in the first recital—not below the third recital. *See* Am. MIPA at 2.

For two reasons, I need not discern the origin of this conundrum nor explain its contradictions. First, the third recital is not binding. Second, even if it bound the parties, Eat Well received what the recital most clearly called for—unregistered Scienture stock.

Ordinarily, recitals to a contract are not binding, enforceable provisions. *See Glob. Cap. Partners LLC v. Green Sapphire Holdings, Inc.*, 355 A.3d 120, 166 (Del. Ch.), *judgment entered*, (Del. Ch. 2026). Parties to a contract can make them binding by explicitly incorporating them into the operative portion of the agreement. *See id.* No party addresses whether the incorporation of the definitions found in the recitals, *see* MIPA at 3, 6–7, is sufficient to create a

binding obligation regarding Scienture's stock on anyone (notwithstanding the nonsensical nature of the "Public Closing" definition). Rather, both sides appear to assume that the recitals are binding, though they offer differing interpretations as explained above. *See* Pl.'s Resp. at 4; Defs.' Reply at 4.

Merely incorporating the definitions is not enough to override the default understanding and impose a binding obligation regarding Scienture's shares. *Cf. Glob. Cap.*, 355 A.3d at 166 (finding recitals incorporated where the contract stated that "the parties 'acknowledge the accuracy of the recitals set forth above, which are incorporated herein as if set forth herein and form a part of this Agreement' "); *US HF Cellular Commc'ns, LLC v. Stiegler*, No. CV 11363-VCS, 2017 WL 4548461, at *7 (Del. Ch. Oct. 12, 2017) (finding an obligation in a recital incorporated where an operative provision included "As stated in the Recitals to this Agreement . . ."). This is especially true when the third recital would introduce a binding obligation, though it is unclear on whom such an obligation would rest, that is incomprehensible in the light of the rest of the MIPA and its definitions. *See Fletcher v. Feutz*, 246 A.3d 540, 555 (Del. 2021) ("Generally, recitals are not a necessary part of a contract and can only be used to explain some apparent doubt with respect to the intended meaning of the operative or granting part of the instrument. If the recitals are inconsistent with the operative or granting part, the latter controls." (citation modified)). In the absence of any binding effect from the third recital, the

foregoing analysis regarding the contracts holds, and Scienture is entitled to summary judgment on Count IV as far as the equity consideration owed.

Even if the third recital's language bound Superlatus or Scienture to deliver unregistered shares in Scienture in an amount equivalent to $8.5 million, as Eat Well contends, *see* Pl.'s MSJ at 23, 25; Pl.'s Resp. at 4, there is no breach because Eat Well received exactly that. As described above, it is undisputed that "Scienture issued Eat Well 11,643.84 shares of Series B Preferred Stock," JSUF ¶ 19, and that Eat Well maintained the same number of such shares even after Amendment No. 1, *see id.* ¶ 27. Further, Eat Well admits that those shares were issued in an amount valued at $8.5 million. *See* Pl.'s MSJ at 28 n.2. It is undisputed that the "shares were unregistered." *See* Defs.' Resp. at 16; *see generally* Pl.'s Reply (failing to dispute this fact).

Eat Well argues that "unregistered [Scienture] public company shares" means common stock in Scienture. *See* Pl.'s MSJ at 23 (asserting, without support, that " '[u]nregistered' is a standard term describing shares issued in a private placement that are subject to temporary transfer restrictions"), 35 (contending that Scienture owed Eat Well $8.5 million in common stock); Pl.'s Reply at 4 n.1 (identifying a district court order from 1994 and an SEC No-Action Letter from 1991 as support for the idea that "unregistered" securities could be understood to mean "common stock").

Although it is true that in some contexts "unregistered shares" could refer to common stock, in the light of the agreements here, this argument fails. "One principle of contract interpretation in Delaware is that the use of different language in different sections of a contract suggests the difference is intentional—*i.e.*, the parties intended for the sections to have different meanings." *Williams Companies, Inc. v. Energy Transfer LP*, No. CV 12168-VCG, 2020 WL 3581095, at *12 n.123 (Del. Ch. July 2, 2020). The amended MIPA uses "common stock" in Section 2.02(a). *See* Am. MIPA at 2. Thus, "unregistered [Scienture] public company shares" in the amended MIPA's third recital differs from "common stock." Had the signatories intended for the third recital to refer to "common stock," the language would have said just that. Instead, the third recital means simply what it says, unregistered shares in Scienture, which was, and is, a public company.

It is undisputed that Scienture gave Eat Well unregistered shares in Scienture that were valued at $8.5 million. Even if the third recital was binding, the only reasonable interpretation of the amended MIPA and AMA would be the Defendants' reading—that, as far as the equity compensation ultimately due to Eat Well, the contracts required that Eat Well receive unregistered shares in Scienture in the amount of $8.5 million. *See* Defs.' MSJ at 8; Defs.' Resp. at 16–17. Under that interpretation, Eat Well received the equity it bargained for, and Scienture is entitled to summary judgment on

Count IV to the extent that Count IV seeks to recover for breach of the amended MIPA's equity consideration provision. *See BioVeris Corp.*, 2017 WL 5035530, at *5.

Lastly, Eat Well seeks to create a genuine dispute of material fact regarding whether it ever "received" the Superlatus stock owed to it under Section 2.02(a) of the amended MIPA. *See* Pl.'s Resp. at 4–8, Pl.'s Reply at 3, 5, 9. In support, Eat Well submits a declaration from its co-founder and Chief Corporate Officer, Spencer MacLean. *See* MacLean Decl. (Doc. 112) ¶ 10. MacLean declares that, "[a]t no point during or after the closing did Eat Well receive a stock certificate, share ledger entry, or any other communication from Superlatus reflecting that shares of Superlatus stock had been issued to Eat Well. Eat Well never held an equity position in Superlatus. The only share certificate Eat Well received in connection with the sale of Sapientia was issued by Scienture (then TRxADE Health, Inc.) through its transfer agent, Securities Transfer Corporation. That certificate reflected shares of a newly created Series B Preferred Stock in Scienture – not common stock in Superlatus, and not the tradeable common equity in Scienture that the MIPA contemplated." *Id.*

MacLean's statements in his declaration that Eat Well did not "receive a stock certificate, share ledger entry, or any other communication" and that "[t]he only share certificate Eat Well received" came from Scienture do not

contradict his deposition testimony. *See* MacLean Dep. (Doc. 115-2) 103:9–13 (testifying that Eat Well did not receive stock from Superlatus because it "received the share certificate directly from – directly from the transfer agent from [Scienture]"), 109:9–16 (same). Thus, Scienture's objection that the declaration as to this part should be disregarded under the sham-affidavit doctrine fails. *See* Defs.' Resp. at 13–15; *see Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1306 (11th Cir. 2016) (explaining that a court may disregard a statement in an affidavit "as a matter of law when, without explanation, it flatly contradicts his or her own prior deposition testimony for the transparent purpose of creating a genuine issue of fact where none existed previously").

But Eat Well overly focuses on the lack of a receipt of a certificate or the existence of an entry on a share ledger reflecting the transaction to prove that it never received the equity. *See, e.g.*, *McAllister v. Kallop*, No. CIV. A. 12856, 1995 WL 462210, at *18 (Del. Ch. July 28, 1995), *aff'd*, 678 A.2d 526 (Del. 1996) (holding that under Delaware law, "[r]ecordation is not a requirement of stock transfer" and "does not preclude constructive delivery"); *Brown v. Fenimore*, No. 4097, 1977 WL 2566, at *2 (Del. Ch. Jan. 11, 1977) ("[I]t is settled that the status of a stockholder in a corporation is not dependent on the issuance to him of a certificate of stock, a certificate being only an indicia of ownership or a muniment of title."); *Pac. Nat. Bank v. Eaton*, 141 U.S. 227, 234 (1891) ("A certificate is authentic evidence of title to stock; but it is not the stock itself,

nor is it necessary to the existence of the stock. It certifies to a fact which exists independently of itself."). That Eat Well never received, for example, a Superlatus stock certificate does not preclude entry of summary judgment against it because Delaware law does not require receipt of any such certificate, and as explained below, MacLean's deposition and Eat Well's interrogatory responses admitting to possessing equity in Superlatus stand unrebutted.

MacLean's declaration that "Eat Well never held an equity position in Superlatus" is an unexplained contradiction of his earlier deposition testimony. MacLean Decl. ¶ 10. During his deposition, MacLean reviewed Eat Well's interrogatory responses. *See* MacLean Dep. 105:10–22, 106:2–18. One interrogatory question asked Eat Well to state "the number of shares of stock in Superlatus, Inc. that you owned following the closing of the MIPA but prior to the closing of the [AMA], and the class of shares to which each share belonged." Pl.'s Answers to Interrogatories (Doc. 115-1) at 4. Eat Well responded that "following the closing of the MIPA and prior to the closing of the [AMA], Eat Well's equity interest consisted of the number of shares of Superlatus common stock necessary to equal $8.5 million in equity value at closing." *Id*. MacLean repeatedly confirmed that the interrogatory responses were true and correct. *See* MacLean Dep. 105:23–25, 106:2–107:6, 107:16–108:1. After he reviewed the contracts, and the interrogatory answers and affirmed their accuracy, MacLean was asked: "So there was a point – there was

a period where Eat Well had an equity interest that was Superlatus common stock in an amount representing [$]8.5 million?" *Id.* 110:20–22. MacLean responded "Correct. Yes." *Id.* 110:23. He was also asked if the integrated transaction operated such that "once Superlatus became a subsidiary of [Scienture], that the shares that Eat Well had gotten in Superlatus, that [$]8.5 that we talked about previously, that those would be exchanged for [Scienture] shares?" *Id.* 111:9–12. Again, MacLean responded "Correct." *Id.* 111:13.

Eat Well does not explain this contradiction. Rather Eat Well accuses the Defendants of misrepresenting the deposition testimony. *See* Pl.'s Resp. at 6–8; Pl.'s Reply at 5–6. Although the Defendants delved into the deposition testimony in less detail than the above, they did not misrepresent it. *See* Defs.' Resp. at 13–14. Eat Well doubles down on its theory that the stock must have been physically received to comply with the amended MIPA and that the "transitional equity interest" was insufficient. *See* Pl.'s Resp. at 7–8; Pl.'s Reply at 5. As explained above, this argument is without merit.

Because this portion of MacLean's declaration, Maclean Decl. ¶ 10, contradicts his earlier deposition testimony without explanation, I disregard its statement that "Eat Well never held an equity position in Superlatus." Thus, there is no material dispute of fact regarding whether Eat Well received the equity interest in Superlatus in the amount of $8.5 million. *See* MacLean Dep. 110:20–23; Pl.'s Answers to Interrogatories at 4.

There is no genuine dispute of material fact regarding Count IV's claim for breach of the equity consideration component of the transaction. Under the only reasonable interpretation of the integrated transaction, there was no breach of the equity consideration owed to Eat Well. Thus, I need not consider Eat Well's agency or adoption arguments for why Scienture is liable for the breach—none exists. I deny Eat Well's motion for partial summary judgment on these points. I grant summary judgment for Scienture to the extent of Count IV's equity consideration claim.

Although the Defendants move for summary judgment on all of Count IV, see Defs.' MSJ at 26, they do not directly address Count IV's attempts to recover for breach of the cash and debenture portions of the consideration. To the extent that they make scattershot arguments that might have some relevancy to Count IV, the Defendants never explain how these arguments entitle them to dismissal of the remainder of Count IV. *See* Defs.' MSJ at 14. Eat Well expressly limited its motion for summary judgment to the theories for liability on the equity consideration, and the Defendants similarly disclaimed that their response addressed anything beyond the equity consideration. *See* Defs.' Resp. at 1 n.1. Thus, the Defendants fail to demonstrate that they are entitled to summary judgment on the entirety of Count IV.

**2. Promissory Estoppel**

"In Florida, the doctrine of promissory estoppel 'applies when there is (1) a promise which the promisor should reasonably expect to induce action or forbearance, (2) action or forbearance in reliance on the promise, and (3) injustice resulting if the promise is not enforced.' " *Bloch v. Wells Fargo Home Mortg.*, 755 F.3d 886, 889 (11th Cir. 2014) (quoting *DK Arena, Inc. v. EB Acquisitions I, LLC*, 112 So. 3d 85, 96 (Fla. 2013)). The purported promise must not be "indefinite *as to terms and time*." *W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 924 (Fla. 1989). When determining if injustice will result if the promise is not enforced, courts should consider "the reasonableness of the promisee's reliance" on the promise. *See id.* (citation modified) (quoting Restatement (Second) of Contracts § 90 (1979)). "For promissory estoppel to be applied, the evidence must be clear and convincing." *Vencor Hosps. v. Blue Cross Blue Shield of Rhode Island*, 284 F.3d 1174, 1185 (11th Cir. 2002) (quoting *W.R. Grace*, 547 So. 2d at 925).

Eat Well's promissory estoppel claim is premised on the Defendants' "post-closing conduct." Pl.'s MSJ at 29. Eat Well argues that the promise made was that the Defendants would convert Eat Well's preferred shares to common stock after Scienture completed its audit. In support it identifies the following statements:

On September 6, 2023, Ajjarapu responded to Eat Well's request for notice of conversion by stating that, "We are waiting on SEC approval to get this meeting going." Pl.'s MSJ at 30; Doc. 116-9 at 2.

On March 8, 2024, Scienture's outside counsel responded to Eat Well's email asking for "more clarity around the recent [Scienture] filings and press release" by saying, "I don't have much to add. We still need the materials so [Scienture] can complete its audit so that you can convert the preferred shares." Pl.'s MSJ at 30; Doc. 116-11 at 2.

On March 15, 2024, Ajjarapu forwarded to Eat Well an email chain from Scienture's auditors requesting assistance with reconciling certain items. *See* Pl.'s MSJ at 31; Doc. 116-12. The auditors represented that, absent receipt of the information, they would be unable to complete the audit and file the 10-K form with the SEC. *See* Doc. 116-12. Ajjarapu's email to Eat Well stated, "Please look into this otherwise further delays filing." *Id.*

On May 14, 2024, Ajjarapu again forwarded an email to Eat Well from one of Scienture's auditors, who requested assistance. Pl.'s MSJ at 31; Doc. 116-13. Ajjarapu's email said, "Please do the needful at the earliest." Doc. 116-13.

On May 20, 2024, after seeing "the Preliminary Proxy Statement dated May 17, 2024," Eat Well emailed Ajjarapu and asked, "is this the proxy process that will initiate the conversion of our EWG preferred shares to commons?"

Pl.'s MSJ at 31; Doc. 116-14. Ajjarapu responded, "That's not in the agenda." Doc. 116-14.

On June 24, 2024, Eat Well asked Ajjarapu for an update on converting Eat Well's preferred shares. Doc. 116-15. Ajjarapu responded that, "It has to be submitted to shareholders. Then shareholders to vote for the item. [Scienture] does not owe any money to any one." *Id.* On July 2, 2024, Eat Well asked for another update. *Id.* Ajjarapu responded that, "We filed 10Q all of the info update till filing date." *Id.* Eat Well then asked, "When are shareholders voting?" *Id.* Ajjarapu responded, "When we file proxy will let you know." *Id.*; *see* Pl.'s MSJ at 31.

The Defendants argue that these statements are not promises that Eat Well's shares would be converted. *See* Defs.' MSJ at 22–23; Defs.' Resp. at 27–29. I agree. In context, none amount to any such promise. *See Bloch*, 755 F.3d at 889 (affirming summary judgment on a promissory estoppel claim in part because a statement that the plaintiffs "may be eligible" for a loan modification was not a binding promise that the plaintiffs would receive the loan modification). The March 8, 2024 email might be the closest, but it merely states the known condition precedent to any possible conversion—that the audit must be completed. This statement certainly was not definite as to what terms the Defendants would be forced to fulfill or the time that any conversion would occur. *See W.R. Grace*, 547 So. 2d at 924.

Eat Well responds that Scienture's "fil[ing] a proxy for a special meeting of shareholders" in August 2023 that include a proposal to convert Eat Well's shares informed the background to these other communications. Pl.'s Resp. at 14. Eat Well contends that "Scienture then abandoned that process, but continued to promise its completion." *Id.* Again, none of the identified statements, even in the light of the proxy statement, are definite promises to convert Eat Well's shares.

Further, even if these statements had amounted to a promise that Eat Well's shares would be converted, Eat Well's reliance on the promise was unreasonable because Eat Well knew that the shares could be converted only if the Scienture stockholders voted to do so. *See* Defs.' MSJ at 24; Defs.' Resp. at 29–31; Defs.' Reply at 9. Indeed, on June 26, 2023, Scienture filed a form 8-K with the SEC that stated that "the Series B Preferred Stock is not convertible at the election of the holder. Upon approval of conversion by the Company's stockholders, each outstanding share of Series B Preferred Stock . . . shall automatically convert into 100 shares of the Company's common stock." (Doc. 115-4) ¶ 3, *id.* at 7. The preliminary proxy statement that Eat Well cites in support of its arguments also states this plainly: "Stockholder approval is a requirement for the [Scienture] Series B Preferred Stock to be convertible into [Scienture] Common Stock." Doc. 126-6 at 28. Eat Well responds to this by claiming, without identifying any legal authority in support, that "[r]elying on

a party to execute the precise action its own corporate instrument mandates is reasonable on its face." *See* Pl.'s Reply at 12.

In the light of the known limitations on the ability of anyone other than a majority of the Scienture shareholders to convert the stock, Eat Well's reliance on a promise to convert the shares—had one even existed—was unreasonable. *Cf. Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1351 (S.D. Fla. 1999) (granting summary judgment in favor of the defendant on a promissory estoppel claim in part because reliance on promises that contradicted an express written contract was unreasonable), *aff'd sub nom. Eclipse Med., Inc. v. Am. Hydro-Surgical*, 235 F.3d 1344 (11th Cir. 2000).

Eat Well's motion for partial summary judgment as to liability on its promissory estoppel claim is denied. The Defendants' motion for summary judgment on the promissory estoppel claim is granted.

**3. Breach of Promissory Notes**

From August 2021 through February 2023, before the transactions at the heart of this dispute, "Sapientia executed a series of ten promissory notes in favor of Eat Well, totaling $755,000 in principal." 2d Am. Compl. ¶ 148; *see* Audit Letter (Doc. 57-5) at 2. The notes' maturity dates range from August 2023 through February 2025. 2d Am. Compl. ¶ 148. The notes remain unpaid. *See id.* ¶ 158. Eat Well alleges that Sapientia's debt, including the promissory

notes, survived the sale to Superlatus, which "became the obligor on the notes." *See id.* ¶ 149. In Count V, Eat Well seeks to hold Scienture liable for the unpaid promissory notes through a breach of contract action. *See id.* ¶¶ 147–160. The Defendants move for summary judgment on Count V. *See* Defs.' MSJ at 26.

The parties largely argue past one another. The Defendants aver that none of the amended MIPA, the AMA, Scienture's SEC filings, or various audit letters obligate Scienture to pay the promissory notes, *see* Defs.' MSJ at 11–14, and Eat Well responds that these are contract interpretation arguments (which Eat Well does not appear to contest) that do not reach the relevant question regarding its theories of liability through agency or adoption, *see* Pl.'s Resp. at 9. Although the Defendants address this in reply, *see* Defs.' Reply at 5–7, they fail to persuade that there are no genuine disputes of material fact as to the Defendants' control (or lack thereof) over Superlatus' acquisition of Sapientia and the decisions to not pay the promissory notes or the adoption of those debts. *See, e.g.*, Pl.'s MSJ at 20–21 (identifying Scienture's right to review and approve Superlatus' tentative agreement to purchase Sapientia and Scienture's complete ownership of Superlatus following the closing of the AMA); *id.* at 26 (identifying Scienture's statement in Amendment No. 1 that, to the extent that clawing back shares of preferred stock "affect[ed] Superlatus' obligations under the [amended MIPA]," Scienture would take at least some action to allow Superlatus to comply with the obligations). Nor do the

Defendants persuade that, even if there were no dispute of fact, they are entitled to judgment as a matter of law.

The Defendants' motion for summary judgment on the breach of the promissory notes claim is denied.

**4. Negligent Misrepresentation**

Under Florida law, "to establish negligent misrepresentation, a party is required to prove: (1) a misrepresentation of material fact that the defendant believed to be true but which was in fact false; (2) that defendant should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely on the misrepresentation; and (4) the plaintiff acted in justifiable reliance upon the misrepresentation, resulting in injury." *Arlington Pebble Creek, LLC v. Campus Edge Condo. Ass'n, Inc.*, 232 So. 3d 502, 505 (Fla. 1st DCA 2017).

The Defendants move for summary judgment on Eat Well's negligent misrepresentation claim because, under Florida law, "[a] party cannot rely to his detriment on an unenforceable promise." Defs.' MSJ at 22 (quoting *Bankers Tr. Co. v. Basciano*, 960 So. 2d 773, 778 (Fla. 5th DCA 2007)). The Defendants appear to aver that, for the same reasons that the promissory estoppel claim would fail because it was unreasonable to rely on any promise to convert the shares, the negligent misrepresentation claim fails because Eat Well

unjustifiably relied on an unenforceable promise. *See id.* at 22–24 (analyzing the claims, which are based on the same statements, together).

Eat Well does not respond in defense of its negligent misrepresentation claim. *See* Pl.'s Resp. at 15 (responding regarding its promissory estoppel claim but making no mention of the negligent misrepresentation claim).

I agree with the Defendants that any promise to convert the shares would be unenforceable in the light of the known limitations on converting the shares, and thus any reliance Eat Well placed on the Defendants' statements was unjustifiable. Further, Eat Well has abandoned this claim. *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (explaining that the burden is on the parties to respond to arguments at summary judgment to "avoid judgment against" the party) (quoting *Ryan v. Int'l Union of Operating Eng'rs, Local 675,* 794 F.2d 641, 643 (11th Cir.1986)); *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 432–34 (11th Cir. 2014) (per curiam) (affirming summary judgment that the trial court granted because the plaintiffs abandoned their claims when they failed to respond to the defendant's arguments for summary judgment).

The Defendants' motion for summary judgment on the negligent misrepresentation claim is granted.

### 5. Unjust Enrichment

Under Florida law, the elements of an unjust enrichment claim are "a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla. 2004) (citation omitted).

Eat Well asserts two theories for unjust enrichment. *See* Pl.'s Resp. at 19–20. The first is based on the sale of Sapientia to Superlatus, which was immediately merged into Scienture. *See* 2d Am. Compl. ¶¶ 171–75. The second theory is premised on Eat Well's post-closing "assistance in preparing financial records and SEC audit responses relating to the Sapientia business." *See id.* ¶¶ 176–77.

Not recognizing the multiple theories, the Defendants move for summary judgment on the unjust enrichment claim and argue that the sale of Sapientia was not a benefit conferred directly upon the Defendants and that the existence of a contract covering the same matter precludes the unjust enrichment claim. *See* Defs.' MSJ at 25. Eat Well responds by arguing that the Defendants still received a direct benefit from the sale even if Superlatus is the entity that purchased Sapientia and that the contract bar does not apply when there is doubt surrounding the enforceability or existence of the contract. *See* Pl.'s

Resp. at 19–20. Eat Well also notes that the Defendants did not address the second theory. *See id.* The Defendants reply that, as to the second theory, Eat Well fails to identify any evidence demonstrating the existence of a triable issue of fact. Defs.' Reply at 11.

The Defendants are correct that Florida law has "long held that a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter," *Palma v. S. Fla. Pulmonary & Critical Care, LLC*, 307 So. 3d 860, 867 (Fla. 3d DCA 2020), and that "to prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant." *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017).

Here, the integrated transaction and its contracts—the amended MIPA and AMA—govern the sale of Sapientia and the consideration owed to Eat Well in return. Contrary to Eat Well's contention, there is no doubt as to the enforceability or existence of the contracts. Eat Well cannot bring its unjust enrichment claim for the sale of Sapientia.

As for its second theory, Eat Well did not have to identify specific triable issues of fact in support because the Defendants did not properly move to dismiss the claim as to that theory. *See WBY, Inc. v. DeKalb County*, 695 F. App'x 486, 492 (11th Cir. 2017) (per curiam) (holding that a reply brief in support of a motion for summary judgment is "not a vehicle to present new

arguments or theories" (citing *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005))). Thus, I grant summary judgment on the unjust enrichment claim only as to the first theory based on the sale of Sapientia. The claim may proceed to trial as far as to the theory regarding the post-closing assistance that Eat Well provided to Scienture.

**6. Breaches of Fiduciary Duties**

Under Delaware law, a claim for breach of fiduciary duties "has only two formal elements: (i) the existence of a fiduciary duty that the defendant owes to the plaintiff and (ii) a breach of that duty." *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 840–41 (Del. Ch. 2022), *judgment entered sub nom. In re Metro Storage Int'l LLC v. Harron* (Del. Ch. 2022).

The Defendants move for summary judgment on the claims for breach of fiduciary duties because the claims are superseded by the contracts that make up the integrated transaction and the Defendants did not owe Eat Well a fiduciary duty as to conversion of its preferred shares. *See* Defs.' MSJ at 18–19 (citing *Frederick Hsu Living Tr. v. ODN Holding Corp.*, No. CV 12108–VCL, 2017 WL 1437308, at *21 (Del. Ch.), *as corrected* (Apr. 25, 2017) and *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010)).

The Defendants are correct that, "where a dispute arises from obligations that are expressly addressed by contract," Delaware law does not allow claims for breach of fiduciary duty "arising out of the same facts that

underlie the contract obligations." *Nemec*, 991 A.2d at 1129. This forecloses Eat Well's theories of fiduciary duty breach to the extent that they are based on obligations found in the amended MIPA, AMA, or Amendment No. 1.

The Defendants are also correct that "[a] board does not owe fiduciary duties to preferred stockholders when considering whether or not to take corporate action that might trigger or circumvent the preferred stockholders' contractual rights." *Frederick Hsu*, 2017 WL 1437308, at *21 (citation modified). Indeed, "as a general matter, the rights and preferences of preferred stock are contractual in nature." *Id.* (citation modified). "Preferred stockholders are owed fiduciary duties only when they do not invoke their special contractual rights and rely on a right shared equally with the common stock." *Id.* (citation modified). "For example, just as common stockholders can challenge a disproportionate allocation of merger consideration, so too can preferred stockholders who do not possess and are not limited by a contractual entitlement." *Id.* (citation modified). This precludes Eat Well's breach of fiduciary duty claims to the extent that they are based on the Defendants' purported failure to convert Eat Well's preferred shares into common shares

or to enable Eat Well to participate in the March and July 2024 dividend payments.[7]

Eat Well responds in several ways, most of which are ineffective. First, Eat Well argues that Delaware case law regarding the lack of applicable fiduciary duties owed to preferred shareholders in situations akin to Eat Well's does not apply because it did not bargain for the preferred shares. *See* Pl.'s Resp at 17–18 ("Both doctrines presuppose a holder who bargained for the contractual rights it seeks to enforce. Eat Well did not. . . . Eat Well never negotiated for, purchased, or signed any agreement adopting the Series B terms. *Frederick Hsu's* foreclosure rule applies only where the holder 'invoke[d] [its] special contractual rights.' . . . A holder who never agreed to those rights has none to invoke."). But Eat Well is mistaken about the meaning of the

[7] I note that the Defendants separately argue that the mechanics of the integrated contracts are such that, under no circumstances, including conversion of its preferred shares at any time, could Eat Well have received the March and July 2024 dividend payments that Eat Well frequently complains it should have received. *See* Defs.' MSJ at 15–18 (explaining that conversion of Eat Well's shares would have immediately triggered a separate stock swap that, in relevant part, would have prevented the Defendants from directing the dividend payments). Eat Well does not contest the Defendants' analysis beyond stating that this merely precludes recovery of any such damages and is not, alone, a basis for summary judgment on any claim. *See* Pl.'s Resp. at 15–16. I agree with the Defendants' analysis. In any event, Eat Well does not contend that it should still be able to recover these damages.

integrated transaction and what shares it would acquire through it, rendering unpersuasive this argument to ignore the ordinary rule in Delaware law.

Eat Well also argues that its claims are not foreclosed under Delaware law because it "does not seek to enforce conversion" and instead "seeks damages for conduct that destroyed the value the conversion mechanism was supposed to deliver." Pl.'s Resp. at 19. Eat Well cites no authority in support and does not expound on this argument. In any event, this argument fails to circumvent the established principle that no fiduciary duty is owed to preferred stockholders asserting claims based on their special contractual rights—such as Eat Well's right to have their shares convert upon a vote of the shareholders. *See Frederick Hsu*, 2017 WL 1437308, at *21.

Lastly, Eat Well contends that the conduct underpinning its breach of fiduciary duty claims includes conduct that lies outside any contract or the special contractual rights it had as a preferred shareholder. *See* Pl.'s Resp. at 18. With one exception, the actions listed are part of the failure to convert Eat Well's shares, are premised on contractual conduct for which no duty was owed, or, in the case of the sale of assets in February 2024, are not pleaded as grounds for breach in the complaint. *See id.*; 2d Am. Compl. ¶¶ 111, 119; *Dukes v.*

*Deaton*, 852 F.3d 1035, 1046 (11th Cir. 2017) (holding that a party may not raise new theories for liability in response to a summary judgment motion).

The sole exception is the sale of Superlatus for one dollar in March 2024. Because of the explicit limitations on the rights accompanying Eat Well's preferred shares, *see* Pl.'s Resp. at 17 (describing the preferred shares' lack of voting rights and liquidation preference); (Doc. 115-4) at 7 ("[T]he Series B Preferred Stock is non-participating and shall receive no dividends, has no liquidation preference, has no voting rights, and has no redemption rights"), it may well be that Eat Well had no "right shared equally with the common stock" giving rise to fiduciary duties owed it by the Defendants with regard to that transaction, *Frederick Hsu*, 2017 WL 1437308, at *21. But the Defendants failed to respond to Eat Well's identification of the March 2024 sale as a basis for the breach of fiduciary duty claim. *See* Defs.' Reply at 9–10.

Thus, the Defendants are entitled to summary judgment on the claims for breach of fiduciary duty to the extent that Eat Well asserts a theory premised on conduct other than the sale of Superlatus for one dollar. Counts I and II may proceed to trial on this theory alone.

**7. Aiding and Abetting Breach of Fiduciary Duty and Civil Conspiracy**

The Defendants argue that Eat Well cannot establish the scienter elements of the aiding and abetting and civil conspiracy claims. *See* Defs.' MSJ

at 19–20; *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038–39 (Del. Ch. 2006) ("Like the test for civil conspiracy, the test for stating an aiding and abetting claim is a stringent one, turning on proof of scienter . . . ."). Eat Well does not respond in defense of either claim. *See generally* Pl.'s Resp. Thus, Eat Well has abandoned these claims, and I grant summary judgment on Counts III and X. *See Resol. Tr. Corp.*, 43 F.3d at 599; *Jones*, 564 F. App'x at 432–34.

### B. *Daubert* Motions

Eat Well's damages expert, Erick West, provides eight opinions in his report. Of these, four pertain to damages from claims or theories that are no longer part of this action. *See* West Report (Doc. 114-1) at 5 (describing damages opinions, including opinions regarding inability to sell shares of common stock in Scienture or to participate in the March and July 2024 dividends). Another fails to comply with Federal Rule of Civil Procedure 26(a)(2)(B)(i). *See* West Report at 5–6, 13–14 (describing West's eighth opinion, which was a nascent, still "pending" opinion regarding other speculative consequential damages). The remaining three calculate the damages from the Defendants' purported failure to pay the cash and debenture consideration for the sale of Sapientia or the other promissory notes allegedly due to Eat Well. *See id.* at 5, 11–13. Because these three opinions are the only remaining relevant opinions, I limit my analysis to them.

The Defendants put forth multiple arguments for excluding West and his testimony. *See generally* Defs.' *Daubert* Mot. I need to consider only one. The Defendants aver that West's "testimony would [not] be helpful to the jury," thus his opinions should be excluded. *See id.* at 9–10. Eat Well contends that West's testimony "will assist the jury by synthesizing complex financial information into a coherent damages figure" because the "calculations require specialized knowledge that a lay juror would not possess." Pl.'s *Daubert* Resp. at 6. This might have been accurate for the opinions on liquidating common stock, but it is not for the remaining opinions, which require only straightforward interest rate calculations based on the unpaid cash and debenture from the sale of Sapientia to Superlatus and the unpaid promissory notes. Such "testimony is based on simple math," *Perez v. DSI Contracting, Inc.*, No. 1:14-CV-282-LMM, 2015 WL 12618779, at *7 n.5 (N.D. Ga. July 24, 2015), rather than "scientific, technical, or other specialized knowledge," FED. R. EVID. 702(a). Although Eat Well may be able to recover damages from its unjust enrichment claim for the uncompensated post-closing assistance to Scienture, its breach of fiduciary duty claims regarding the sale of Superlatus for one dollar, or its fraudulent transfer claim, West did not provide opinions related to these claims.

I disagree with Eat Well's contention that the determining damages is beyond the jury without West's "sourc[ing] the applicable prejudgment interest

rates" and "correctly calculat[ing] compounding interest on multiple debt instruments with different maturity dates." Pl.'s *Daubert* Resp. at 6. And, in any event, West "offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262–63; *cf. Matos v. Bus. L. Grp., P.A.*, No. 6:18-cv-1105-ORL-31DCI, 2019 WL 3557245, at *2 (M.D. Fla. Aug. 5, 2019) (denying a *Daubert* motion because the expert was going to analyze account ledgers to determine if charges were properly calculated rather than "just calculate interest on a specific amount, at a specified rate, and over a particular time period").

Because West's opinions that are relevant to the surviving claims would not use scientific, technical, or other specialized knowledge to help the jury to understand the evidence or to determine a fact in issue, I grant the Defendants' *Daubert* motion and exclude West's testimony. Because West is excluded, I deny as moot Eat Well's *Daubert* motion and motion to strike the Defendants' rebuttal expert, Peter Gampel.

## IV. CONCLUSION

Eat Well's motion for summary judgment is denied. I grant summary judgment in the Defendants' favor on Eat Well's claims for aiding and abetting breach of fiduciary duty (Count III), promissory estoppel (Count VI), negligent misrepresentation (Count VIII), and civil conspiracy (Count X).

I grant summary judgment in the Defendants' favor on Eat Well's claims for breach of fiduciary duty (Counts I and II) for all theories except the sale of Superlatus for one dollar. I also grant summary judgment on Eat Well's claim for breach of the equity consideration owed to it under the integrated transaction (Count IV). Count IV survives as to the breach of the cash and debenture portions of the consideration. I grant summary judgment in the Defendants' favor on the unjust enrichment claim (Count VII) to the extent it is premised on the sale of Sapientia to Superlatus.

The following claims and theories remain at issue for trial: Eat Well's claims against Ajjarapu (Count I) and the rest of Scienture's Board (Count II) for breach of fiduciary duty premised on Scienture's sale of Superlatus for one dollar; the claim against Scienture for breach of the cash and debenture portions of the amended MIPA (Count IV); the claims against Scienture for breach of the ten promissory notes signed by Sapientia in favor of Eat Well (Count V); the unjust enrichment claim against Scienture to the extent that it seeks to recover for post-closing audit assistance provided to Scienture (Count VII); and the fraudulent transfer claim against Scienture (Count IX).

The Defendants' *Daubert* motion is granted and Eat Well's *Daubert* motion and motion to strike are denied as moot.

The following is therefore **ORDERED:**

**1.** Eat Well's Motion for Summary Judgment (Doc. 110) is **DENIED**.

**2.** Defendants' Motion for Summary Judgment (Doc. 115) is **GRANTED IN PART**.

**3.** Defendants' *Daubert* Motion (Doc. 114) is **GRANTED.**

**4.** Eat Well's Motion to Strike (Doc. 76) and *Daubert* Motion (Doc. 109) are **DENIED as moot**.

**ORDERED** in Tampa, Florida, on August 27, 2026.

Kathryn Kimball Mizelle
United States District Judge